TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00067-CR






Laura Lynn Oustad, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT

NO. 5869, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING



 


M E M O R A N D U M O P I N I O N


 A jury found appellant Laura Lynn Oustad guilty of one count of unlawful
manufacture of methamphetamine, see Tex. Health & Safety Code Ann. § 481.112 (West 2003), and
one count of possession of pseudoephedrine, an immediate precursor to methamphetamine, with the
intent to manufacture methamphetamine, see id. § 481.124(a)(2) (West Supp. 2008). The jury
assessed Oustad's punishment at twenty-five years' imprisonment for the manufacture offense and
ten years and one day's imprisonment for the possession offense. The jury also assessed a
$5,000 fine for each offense. On appeal, Oustad argues that the evidence was legally and factually
insufficient to sustain the convictions. Because we hold that the evidence was legally and factually
sufficient to support the verdicts, we affirm the judgments of conviction.


BACKGROUND

 On June 7, 2006, officers from the 33rd Judicial District Narcotics Enforcement Team
(NET) executed a search warrant at a residence located at 809 Buckwheat in Tow, Texas. Two of
the NET officers testified that, as they approached the house, they noticed a strong odor consistent
with a clandestine methamphetamine laboratory. The officers found evidence of an active
methamphetamine laboratory being operated in plain view in the kitchen, including diluted
methamphetamine in liquid form, pseudoephedrine, iodine, and glass containers and other household
items adapted for use in the manufacture of methamphetamine. Officer Brent Nichols, a NET
investigator who helped conduct the search, testified that the search yielded methamphetamine in
different stages of completion, which is an indication that there were multiple manufacturing
processes--or "cooks"--taking place in the lab.

 The only person present at the time the search warrant was executed was Catherine
Lejune. However, law enforcement officials had information which indicated that Oustad, her
husband Marty Oustad, and Colton Anderson lived at the address. (1) After executing the search
warrant, the officers executed arrest warrants for Oustad, Marty, and Anderson.

 At trial, Oustad claimed that she did not live at 809 Buckwheat, that she did not
exercise care, control, and custody of any of the contraband items found at that address during the
search, and that she was not involved in the manufacture of methamphetamine on June 7, 2006. 
Oustad testified that she had moved out approximately a month before the search and was living in
Buchanan Dam, Texas. Marty corroborated Oustad's testimony, stating that Oustad moved out one
or two months before the June 7 search and that he did not begin manufacturing methamphetamine
until the beginning of June. Oustad's testimony was also corroborated by Alan Mize, who lived in
Buchanan Dam and claimed that Oustad lived there with him for approximately a month before she
was arrested and again for a few weeks after she was released from jail. Alan's wife, Dena Mize,
also testifed that Oustad lived on their property in Buchanan Dam at some point during the summer
of 2006, but Dena did not remember which month Oustad lived there.

 In order to prove that Oustad still lived at the 809 Buckwheat address, the State relied
on the testimony of two neighbors, Joyce McMillian and Kelly Tarpley. McMillian testified that
Oustad's vehicle was at the address "every day, nearly." McMillian further testified that she saw
Oustad and Marty there the morning of the search. According to McMillian, Oustad and Marty
"were getting ready to go to work. They were getting in their cars." McMillian also testified that
she regularly saw Oustad "mowing the yard, cleaning the yard, hoeing, picking weeds." Tarpley,
McMillian's daughter, also testified to regularly seeing Oustad at the residence "mowing the grass,
playing with the dogs, working on vehicles, just general stuff, coming and going to work." Tarpley
said she had seen Oustad at the residence on June 6, the day before the search warrant was executed.

 In addition, Officer Nichols testified that, as a result of his investigation, he had
personal knowledge that Oustad lived at 809 Buckwheat. (2) Further, Officer Vaught testified that he
and Seargent Faison conducted surveillance on the house prior to obtaining the search warrant and
that they observed Oustad and Marty there together. The State also introduced evidence of a
prescription drug bottle that listed Oustad's name and the 809 Buckwheat address, which NET
officers found in the home during the search.

 The jury was presented with evidence of several pseudoephedrine purchases made
by Oustad in the weeks prior to the search. (3) This evidence, in the form of pharmacy records, reflects
that Oustad purchased thirty-four boxes (4) of cold and allergy medicine from three different
pharmacies located in two different towns between January 12, 2006 and June 5, 2006. The records
from the pharmacy Oustad visited on June 5 listed Oustad's address as 809 Buckwheat, and the
pharmacy manager testified that the store's regular practice was to verify the customer's address by
both checking the customer's driver's license and asking the customer to confirm that the address
on the driver's license was correct. In addition, the State introduced evidence that Oustad gave her
address as 809 Buckwheat when she was booked into jail on June 7. Finally, the State introduced
Marty's reports to his parole officer from May 16, 2006 and June 29, 2006, in which he stated that
Oustad lived with him at the 809 Buckwheat address. (5) 

 Oustad admitted that she gave her address as 809 Buckwheat when she was booked
into jail after her arrests for the offenses at issue in this case, but testified that she only did so
because it was the address on her driver's license. Oustad claimed that the reason she was regularly
seen at the 809 Buckwheat address by McMillian and Tarpley was because Oustad and Marty's
concrete business was operated out of that address. Oustad testified she went to the home:


Because I had animals, dogs that were mine that stayed there with [Marty] at the
house. I would go feed them. And, plus, we had all of our material there, our form
material and if I had to go pick up forms I would go there to the yard, pick them up,
but I mean, that's it.



 Oustad and Marty both testified that all of Oustad's pseudoephedrine purchases were
for her sinus problems and that none of it was used for the manufacture of methamphetamine. 
Oustad claimed that she took two to three pills a night and testified, "I didn't really keep count of
how many I bought whenever--I bought them when I needed them." She further claimed that, when
she made the June 5 purchase, the sales clerk simply took her address from her driver's license and
did not ask her to confirm the address.

 In four issues, Oustad challenges the legal and factual sufficiency of the evidence
to sustain her convictions. Specifically, Oustad contends that the State did not sufficiently
link her to the manufacture of the methamphetamine or the pseudoephedrine found during the
June 7, 2006 search.


STANDARD OF REVIEW

 In reviewing the legal sufficiency of the evidence, we review all of the evidence in
the light most favorable to the verdict. Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim.
App. 2007). The question presented is whether a rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979);
Clayton, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony,
weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. 
Clayton, 235 S.W.3d at 778.

 In reviewing the factual sufficiency of the evidence, we consider all the evidence in
a neutral light, while giving due deference to the jury's determination. See Sims v. State, 99 S.W.3d
600, 601 (Tex. Crim. App. 2003); Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). 
This involves a two-part inquiry. See Johnson v. State, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). 
We first look at the evidence presented in support of the guilty verdict and reverse only if the
evidence "is so weak as to be clearly wrong and manifestly unjust." Id. at 11. If the evidence that
tends to prove the verdict is sufficient standing alone, we then compare it with the evidence the
defendant produces against the verdict, id. at 7, and reverse only if after the comparison the verdict
"is against the great weight and preponderance of the available evidence," id. at 11. (6) The jury is the
sole judge of the credibility of the witnesses and the weight to be accorded their testimony. 
Vasquez, 67 S.W.3d at 236. We may not reweigh the evidence and substitute our judgment for that
of the jury. Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006); King v. State,
29 S.W.3d 556, 563 (Tex. Crim. App. 2000).


DISCUSSION

Manufacture of Methamphetamine

 To prove the manufacture offense, the State had to prove that Oustad knowingly and
intentionally manufactured methamphetamine in the amount of four grams or more but less than
200 grams. (7) See Tex. Health & Safety Code Ann. § 481.002(25) (West Supp. 2008) (defining
manufacture), § 481.102(6) (West Supp. 2008) (listing methamphetamine as controlled substance),
§ 481.112(d) (creating offense of manufacture of controlled substance). The State could establish
the manufacture offense either by showing that Oustad acted on her own to manufacture
methamphetamine, or by showing that Oustad solicited, encouraged, directed, aided, or attempted
to aid Marty, with the intention of promoting or assisting Marty to manufacture methamphetamine. 
See Tex. Penal Code Ann. §§ 7.01-.02 (West 2003). (8) 

 In her first and second issues on appeal, Oustad argues that the evidence was legally
and factually insufficient to prove that she manufactured methamphetamine because the State failed
to sufficiently link her to the manufacturing. To obtain a conviction, "the State must link the
defendant either to an interest in the place where the manufacturing was taking place or to the actual
act of manufacturing." Webb v. State, 275 S.W.3d 22, 27 (Tex. App.--San Antonio 2008, no pet.);
see also East v. State, 722 S.W.2d 170, 171-72 (Tex. App.--Fort Worth 1986, pet. ref'd). The
purpose of the linking requirement is to prove the accused's knowledge and intent and thus protect
the innocent bystander from conviction based on proximity to the laboratory. See Isham v. State,
258 S.W.3d 244, 248 (Tex. App.--Eastland 2008, pet. ref'd). The State may use circumstantial
evidence to link Oustad to the manufacturing. See Connor v. State, 67 S.W.3d 192, 197 (Tex. Crim.
App. 2001) ("A conclusion of guilt can rest on the combined and cumulative force of all
incriminating circumstances."); Wygal v. State, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977)
(under law of parties, "[p]articipation in an enterprise may be inferred from the circumstances and
need not be shown by direct evidence"); Webb, 275 S.W.3d at 27 (manufacture can be established
through circumstantial evidence).

 Oustad claims that the only evidence the State introduced to link her to
809 Buckwheat--and by extension manufacture of the methamphetamine--was a single
prescription bottle found in the home with her name on it. Oustad discounts the testimony of her
neighbors, McMillian and Tarpley, as merely showing that she previously lived at the home, rather
than that she still lived in and exercised control over the residence. Oustad notes that neither
McMillian nor Tarpley testified to seeing Oustad inside the house and maintains that their testimony
that they saw her outside the home the day before and the day of the search is consistent with her
own testimony, and that of Marty and Alan, that she had moved a few weeks prior and only
returned to the residence to retrieve materials for her work with the concrete company and to take
care of her dogs.

 The jury was presented with ample evidence from which it could draw a reasonable
inference that Oustad still lived in and exercised control over the residence at 809 Buckwheat. The
activities which McMillian and Tarpley observed Oustad performing--working in the yard and
playing with the dogs--are typically those of a resident. Furthermore, Tarpley testified that she saw
Oustad leaving for and returning from work--a pattern which is also consistent with Oustad living
in the home. Officer Vaught also testified to observing Oustad at the home when conducting pre-search surveillance and Officer Nichols testified that he had personal knowledge that Oustad lived
at 809 Buckwheat. In addition, the jury was presented with evidence that Oustad regularly gave her
address as 809 Buckwheat: she used the address on her driver's license, gave the address to three
different pharmacies when purchasing pseudoephedrine, and gave the address to the Llano County
jail when arrested for the offenses at issue in this case. This evidence, along with the prescription
bottle with Oustad's name and the 809 Buckwheat address on it that officers found in the home, is
sufficient to allow a reasonable jury to come to the conclusion that Oustad lived at 809 Buckwheat
on the day of the search.

 In response to the State's evidence, Oustad presented her own testimony and that of
Marty, Alan, and Dena. The question of whether and how much to credit this testimony is one for
the jury. Johnson, 23 S.W.3d at 7-9. An appellate court must respect the jury's determinations of
what weight to give conflicting testimonial evidence "because resolution often turns on an
evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was
delivered," unlike the appellate court, which reviews a cold record. Id. at 8. We may not reverse
simply because we would have resolved an apparent conflict in the evidence differently than the
jury. Watson, 204 S.W.3d at 417. Instead, the "great weight and preponderance" of the record
evidence must objectively contradict the jury's verdict before an appellate court can grant a remand
of the cause. Id. Affording appropriate deference to the jury's view of the evidence, we hold that
a reasonable jury could have chosen to disbelieve Oustad's testimony and that of her witnesses. 

 Marty, as Oustad's husband, was an interested witness. See East, 722 S.W.2d at 172
(holding that credibility of testimony from interested witnesses is matter for jury). He had already
been convicted of manufacture and possession and had nothing to lose by taking full responsibility
for the offenses. In his testimony, Marty admitted to manufacturing methamphetamine in 2001, as
well, and it is undisputed that Oustad lived with him there at the time. Further, Marty claimed that
he purchased all of his own pseudoephedrine for his manufacturing lab and denied that Oustad or
Anderson purchased any for him. Yet the jury was presented with evidence that both Oustad and
Anderson made a significant number of pseudoephedrine purchases in the weeks and months
leading up to the search--including the months of January through April when it is undisputed
that Oustad lived at 809 Buckwheat-- and could have viewed this as discrediting Marty's
version of events.

 Furthermore, each of the witnesses--Oustad, Marty, Alan, and Dena-- was unclear
on the time frame for when Oustad had moved out or how long before the search she had been
living on the Mizes' property. Dena testified only that Oustad lived on their property "some time
during that time" of June 7, 2006. Both Oustad and Alan first testified that she lived in Buchanan
Dam for "about a month," then admitted on cross-examination that Oustad was living there on July
6, 2006, a month after the search and her arrest, then revised their testimony to say that she lived
there for about a month before Oustad's arrest and then again for about a month after she was
released from jail. Marty's testimony that Oustad had moved out one to two months before the
search on June 7, and had not returned to the home after being released from jail is inconsistent with
his reports to his parole officer--from May 16, 2006 and June 29, 2006--in which Marty stated that
Oustad was living with him at 809 Buckwheat. Under the circumstances, a reasonable jury could
have chosen not to credit the testimony of these witnesses. See Johnson, 23 S.W.3d at 7-9. 

 Even if the jury credited the evidence that Oustad no longer lived at the address, they
could have found that she still had access to and control over the property. See Webb, 275 S.W.3d
at 27 (stating that "the State must link the defendant either to an interest in the place where the
manufacturing was taking place or to the actual act of manufacturing" (emphasis added)). By
Oustad's own testimony, she and her husband operated their concrete business out of the home. 
Oustad admitted to being at the home regularly for business purposes, as well as to feed and play
with the dogs. In addition, NET officers observed Oustad at the home when conducting
surveillance and McMillian and Tarpley testified to seeing Oustad on the premises consistently,
including the day before and the morning of the search.

 The fact that Oustad had access to and control of the property at 809 Buckwheat is
not enough, by itself, to link her to the manufacture of methamphetamine. However, it is a
circumstance tending to prove guilt that, when combined with other evidence, can be sufficient to
prove guilt beyond a reasonable doubt. See Webb, 275 S.W.3d at 27. 

 In the case at bar, NET officers testified that they found diluted methamphetamine
in liquid form, pseudoephedrine, iodine, and glass containers and other household items adapted
for use in the manufacture of methamphetamine in plain view in the kitchen--and thus open and
obvious to someone who, like Oustad, had a prolonged presence in the home. See id. (open location 
of lab tends to link accused to manufacture). In addition, the officers testified that the lab emitted
a strong odor and McMillian testified that she often detected an odor of "burnt plastic" coming from
the house. See id. ("open odor" tends to link accused to manufacture). Further, according to Officer
Nichols, the laboratory included methamphetamine in different stages of manufacture--an
indication that there were multiple methamphetamine "cooks" over a range of time. The combined
force of this evidence is sufficient to create a reasonable inference that Oustad was not simply an
innocent bystander with no connection to the laboratory. See Harris v. State, No. 02-04-00202-CR,
2005 Tex. App. LEXIS 6179, at *3 (Tex. App.--Fort Worth Aug. 2, 2005, pet. ref'd) (mem. op.,
not designated for publication) (because of open and obvious nature of methamphetamine
laboratories, "the fact that a defendant has a prolonged presence on the premises weighs more
heavily against that defendant"); see also Gilmore v. State, No. 02-06-00302-CR, 2008 Tex. App.
LEXIS 1935, at *6 (Tex. App.--Fort Worth Mar. 13, 2008, no pet.) (mem. op., not designated for
publication) (finding link to location where manufacturing occurred where defendant in house for
"at least the approximate hour" that police surveyed location).

 Finally, Oustad's knowledge of and participation in the manufacture and possession
can be reasonably inferred through her pseudoephedrine purchases. Over the course of five months,
Oustad purchased at least thirty-four packages of cold and allergy medicine, containing at least
45 grams of pseudoephedrine. (9) Even if the jury credited Oustad's testimony that she took two to
three pills a night every night--testimony that the jury was free to disbelieve--Oustad purchased
significantly more pseudoephedrine than she would have taken in a five month period. The fact that
Oustad traveled to three different pharmacies in two different towns to make her purchases also
supports an inference that Oustad was not purchasing the pseudoephedrine for legitimate purposes. 
As noted above, some of the purchases were made during the months of January through April,
when Oustad admitted living at 809 Buckwheat. Furthermore, Officer Nichol's testimony that the
evidence indicated multiple "cooks" of methamphetamine could lead a reasonable jury to infer that
the methamphetamine lab had been operated for some time before the search and was in operation
on June 6 and June 7, when Oustad was observed on the premises by McMillian and Tarpley. The
combined force of this circumstantial evidence would allow a reasonable jury to conclude beyond
a reasonable doubt that Oustad participated in the manufacture of methamphetamine.

 Oustad argues that the pseudoephedrine purchases cannot be used to prove her guilt,
claiming that the purchases are "extraneous acts" and thus were admitted only for the limited
purpose of showing "intent, preparation, plan, knowledge, or absence of mistake." See Tex. R.
Evid. 404(b). Each time the State sought to introduce evidence of Oustad's pseudoephedrine
purchases, Oustad objected, arguing that they constituted evidence of prior bad acts and thus were
inadmissible to show conduct in conformity with those prior acts. See id. However, the State
responded, and the trial court agreed and correctly ruled, that purchases near the time of the search
were res gestae. The trial court did rule that the purchases which were "more remote in time" could
only be admitted for the limited purpose of showing intent, preparation, plan, knowledge, or
absence of mistake. Rather than tell the jury which purchases were too remote in time--an act
which the trial court viewed as impermissibly commenting on the weight of the evidence--the court
included the following in the jury charge:


In reference to evidence, if any, that the defendant has previously participated in
recent transactions or acts, other than but similar to that which is charged in the
indictment in this case, you are instructed that you can not [sic] consider such other
transactions or acts, if any, for any purpose unless you find and believe beyond a
reasonable doubt that the defendant participated in such transactions or committed
such acts, if any; and even then you may only consider the same for the purpose of
determining intent, knowledge, motive, common plan, or scheme if it does, and for
no other purpose.



 Even assuming arguendo that the jury was required to apply the limiting instruction
included in the charge to all of the pseudoephedrine purchases, the evidence could still be used to
show Oustad's intent and knowledge. This is precisely the purpose for which the State introduced
the evidence. The State was required to link Oustad to the manufacture of methamphetamine in
order to prove her knowledge and intent, thus protecting the innocent bystander who happens upon
a laboratory. See Isham, 258 S.W.3d at 248 (affirmative links required to show that accused
"knowingly and intentionally" manufactured methamphetamine). We hold that a reasonable jury
could have reasonably inferred from Oustad's purchases that she knew about, prepared for, and
intentionally participated in the manufacture of methamphetamine.

 Although no direct evidence shows Oustad actively participated in the manufacture
of methamphetamine, the State presented sufficient circumstantial evidence--including that Oustad
was a regular presence at and exercised control over the residence where the drug was
manufactured, that the laboratory was in an open and obvious location, that there was an obvious
smell of methamphetamine manufacture, and that Oustad purchased more cold medicine than is
consistent with personal use--to allow a reasonable jury to rationally infer and find beyond a
reasonable doubt that Oustad manufactured methamphetamine. See Clayton, 235 S.W.3d at 778. 
Therefore, the evidence is legally sufficient to support the conviction.

 Likewise, the State's evidence in support of the guilty verdicts is not so weak as to
be clearly wrong and manifestly unjust. Johnson v. State, 23 S.W.3d at 11. Comparing the State's
evidence to that Oustad produced against the verdict, and giving appropriate deference to the jury's
determination of the weight and credibility of the evidence, we hold that the verdict is not against
the great weight and preponderance of the available evidence. Id.; Watson v. State, 204 S.W.3d at
417. Therefore, the evidence is factually sufficient to support the conviction.

 We overrule Oustad's first and second points of error.


Possession of Pseudoephedrine with Intent to Manufacture Methamphetamine

 To prove the possession offense, the State had to prove that Oustad exercised care,
control, and management over the pseudoephedrine found during the search and that she did so with
the intent to manufacture methamphetamine. See Tex. Penal Code Ann. §§ 481.002(38) (defining
possession), .124(a)(2) (establishing offense of possession of immediate precursor with intent to
manufacture). When the accused is not in exclusive control of the place where the substance is
found, the State must link the accused to the substance through additional facts and circumstances. 
See Evans v. State, 202 S.W.3d 158, 161-62 (Tex. Crim. App. 2006); Poindexter v. State,
153 S.W.3d 402, 406 (Tex. Crim. App. 2005). 

 In her third and fourth issues on appeal, Oustad argues that the evidence was legally
and factually insufficient to prove that she exercised care and control over the pseudoephedrine. 
Here again, Oustad contends that the State failed to sufficiently link her to the pseudoephedrine that
was found during the search. As with the manufacture offense, the State is required to link the
accused to the possession in order to prove the accused's knowledge and intent and thus protect the
innocent bystander from conviction based on proximity to the contraband. See Evans, 202 S.W.3d
at 161-62. In other words, the State must introduce evidence that "generates a reasonable inference
that the defendant knew of the contraband's existence and exercised control over it." Nhem v. State,
129 S.W.3d 696, 699 (Tex. App.--Houston [1st Dist.] 2004, no pet.). The State may use
circumstantial evidence to link Oustad to the pseudoephedrinie. See Connor, 67 S.W.3d
at 197 ("A conclusion of guilt can rest on the combined and cumulative force of all incriminating
circumstances."); Evans, 202 S.W.3d at 162 (possession can be established through
circumstantial evidence).

 As discussed above, the State presented ample evidence to allow the jury to conclude
that Oustad lived in, or at least had access to and exercised control over, the residence at
809 Buckwheat. See Deshong v. State, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981) (whether
contraband "was conveniently accessible to the accused" is factor in linking accused to contraband);
Beall v. State, 237 S.W.3d 841, 850 (Tex. App.--Fort Worth 2007, no pet.) (whether accused
"owned or had the right to possess where the drugs were found" is factor in linking accused to
contraband). The testimony of the neighbors, the observations of the NET officers, Oustad's regular
use of the address when purchasing pseudoephedrine, Oustad's use of the address when being
booked into jail for the offenses at issue, and Oustad's own testimony that she was regularly in the
home for the concrete business and to care for the dogs are sufficient to link Oustad to the address. 
As with the manufacture offense, Oustad's access to the home is insufficient by itself to prove that
she possessed the pseudoephedrine that was found in the home, but is a circumstance tending to
prove guilt that, when combined with other evidence, can prove guilt beyond a reasonable doubt. 
See Evans, 202 S.W.3d at 162; Poindexter, 153 S.W.3d at 411.

 In addition to linking Oustad to the address where the pseudoephedrine was found,
the State also showed that the lab emitted a distinct and obvious odor and that the pseudoephedrine
and other contraband were in plain view in the kitchen--factors which the court of criminal appeals
has held tend to link the accused to possession of the contraband. See Evans, 202 S.W.3d at 162
n.12; Poindexter, 153 S.W.3d at 409; see also Beall, S.W.3d at 850; Nhem, 129 S.W.3d at 699. 
The State also linked Oustad to the pseudoephedrine by showing that she purchased more
pseudoephedrine in the weeks prior to the search than is consistent with personal use. (10) Cf.
Shaffer v. State, 184 S.W.3d 353, 361 (Tex. App.--Fort Worth 2006, pet. ref'd) (possession of large
quantity of cold medicine and manufacturing supplies tends to show intent to manufacture).

 Although no direct evidence shows that Oustad exercised care, control, and
management over the pseudoephedrine found in the home, the State presented sufficient
circumstantial evidence--including that Oustad was a regular presence at and exercised control over
the residence where the contraband was found, that the contraband was in an open and obvious
location, that there was an obvious smell of contraband, and that Oustad purchased more cold
medicine than is consistent with personal use--to allow a reasonable jury to rationally infer and find
beyond a reasonable doubt that Oustad possessed the pseudoephedrine with the intent to
manufacture methamphetamine. See Clayton, 235 S.W.3d at 778. Therefore, the evidence is
legally sufficient to support the conviction.

 Likewise, the State's evidence in support of the guilty verdicts is not so weak as to
be clearly wrong and manifestly unjust. Johnson v. State, 23 S.W.3d at 11. Comparing the State's
evidence to that Oustad produced against the verdict, and giving appropriate deference to the jury's
determination of the weight and credibility of the evidence, we hold that the verdict is not against
the great weight and preponderance of the available evidence. Id.; Watson v. State, 204 S.W.3d at
417. Therefore, the evidence is factually sufficient to support the conviction.

 We overrule Oustad's third and fourth points of error.


CONCLUSION

 Because we hold that the evidence is both legally and factually sufficient to support
the jury's verdicts, we affirm the judgments of conviction.


__________________________________________

 Diane M. Henson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed: April 9, 2009

Do Not Publish
1. Because Marty Oustad shares the same surname as the appellant in this case, we will refer
to him by his first name. We will continue to refer to the appellant as "Oustad."
2. At trial, the following exchange took place between the prosecutor and Officer Nichols:


Q: Now during your investigation who did y'all determine was residing at the
residence where the warrant was served?


A: Marty Oustad--


 [Defense Counsel]: Judge, I'm going to object to personal knowledge,
hearsay.

 The Court: Ask if he had personal--what he knows and how he
has that opinion.


Q: Investigator Nichols, do you have personal knowledge of who was residing at
that residence?


A: Two of them, yes.


Q: And who is that?


A: That was Marty Oustad and Laura Lynn Oustad.
3. Texas law requires a store that sells over-the-counter medicine containing pseudoephedrine
to keep the medicine behind the counter or in a locked cabinet. See Tex. Health & Safety Code
Ann. § 486.013 (West Supp. 2008). Before selling such medicine, the store must require the
customer to show photo identification and sign for the purchase. Id. § 486.014 (West Supp. 2008). 
The store is prohibited from selling more than two packages or six grams of pseudoephedrine in a
single transaction. Id. The store must keep the records from sales of pseudoephedrine for at least
two years. Id. § 486.015 (West Supp. 2008).
4. After the trial court admitted records from two pharmacies showing thirteen purchases,
Officer Nichols testified that the thirteen purchases reflected in the records involved twenty-six boxes or 38.3 grams of pseudoephedrine. Later in the trial, records from a third pharmacy were
admitted into evidence showing six additional purchases that totaled eight boxes or at least
10.38 grams of pseudoephedrine.
5. Marty testified that he listed Oustad as living with him at 809 Buckwheat, because "when
your wife runs off and leaves you when she's messing around on you, it's not nothing you want to
write on paper, you know."
6. The two-part inquiry "is the most equitable approach, especially given the fact criminal
defendants are not under any obligation to present evidence on their behalf and usually rely, instead,
on forcing the State to prove its case beyond a reasonable doubt." Johnson v. State, 23 S.W.3d 1,
11 (Tex. Crim. App. 2000). The second part of the test is applicable "in the event a defendant does
muster contrary evidence," giving the defendant a second ground for factual insufficiency. Id.
7. The Department of Public Safety drug analyst who performed the tests on the evidence
seized during the search testified that three of the items tested contained methamphetamine, together
totaling 95.07 grams, including adulterants and dilutants. See Tex. Health & Safety Code Ann.
§ 481.112(d) (Manufacture offense "is a felony of the first degree if the amount of the controlled
substance to which the offense applies is, by aggregate weight, including adulterants or dilutants,
four grams or more but less than 200 grams.") The amount manufactured is not contested on appeal.
8. Texas law provides that a person is criminally responsible as a party to an offense if the
offense is committed by her own conduct, by the conduct of another for which she is criminally
responsible, or both. See Tex. Penal Code Ann. § 7.01(a) (West 2003). A person is criminally
responsible for an offense committed by the conduct of another if, acting with intent to promote or
assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense. See id. § 7.02(a)(2) (West 2003). For a person to be guilty
under the law of parties, the State must first prove the guilt of another as the primary actor. 
Richardson v. State, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993). Marty was convicted of
possession and manufacture of methamphetamine and possession of pseudoephedrine with intent
to manufacture as a result of the June 7, 2006 search. He testified at Oustad's trial regarding his
conviction and admitted to operating the methamphetamine laboratory, though he denied that Oustad
assisted him in the commission of the offense.
9. See n.6, supra.
10. As with the manufacture offense, the State could use the pseudoephedrine purchases to
link Oustad to the pseudoephedrine found during the search without violating the trial court's
limiting instruction, under which the jury was to consider the evidence only for the purpose of
determining Oustad's knowledge and intent. See Evans v. State, 202 S.W.3d 158, 161-62 n.9
(Tex. Crim. App. 2006) (affirmative links requirement is shorthand for requirement that State
establish that possession is knowing); Nhem v. State, 129 S.W.3d 696, 699 (Tex. App.--Houston
[14th Dist] 2004, no pet.) ("An affirmative link generates a reasonable inference that the defendant
knew of the contraband's existence and exercised control over it.").