# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00067-CR

**Laura Lynn Oustad, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT
### NO. 5869, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Laura Lynn Oustad guilty of one count of unlawful manufacture of methamphetamine, *see* Tex. Health & Safety Code Ann. § 481.112 (West 2003), and one count of possession of pseudoephedrine, an immediate precursor to methamphetamine, with the intent to manufacture methamphetamine, *see id.* § 481.124(a)(2) (West Supp. 2008). The jury assessed Oustad's punishment at twenty-five years' imprisonment for the manufacture offense and ten years and one day's imprisonment for the possession offense. The jury also assessed a $5,000 fine for each offense. On appeal, Oustad argues that the evidence was legally and factually insufficient to sustain the convictions. Because we hold that the evidence was legally and factually sufficient to support the verdicts, we affirm the judgments of conviction.

## BACKGROUND

On June 7, 2006, officers from the 33rd Judicial District Narcotics Enforcement Team (NET) executed a search warrant at a residence located at 809 Buckwheat in Tow, Texas. Two of

the NET officers testified that, as they approached the house, they noticed a strong odor consistent with a clandestine methamphetamine laboratory. The officers found evidence of an active methamphetamine laboratory being operated in plain view in the kitchen, including diluted methamphetamine in liquid form, pseudoephedrine, iodine, and glass containers and other household items adapted for use in the manufacture of methamphetamine. Officer Brent Nichols, a NET investigator who helped conduct the search, testified that the search yielded methamphetamine in different stages of completion, which is an indication that there were multiple manufacturing processes—or "cooks"—taking place in the lab.

The only person present at the time the search warrant was executed was Catherine Lejune. However, law enforcement officials had information which indicated that Oustad, her husband Marty Oustad, and Colton Anderson lived at the address.[1] After executing the search warrant, the officers executed arrest warrants for Oustad, Marty, and Anderson.

At trial, Oustad claimed that she did not live at 809 Buckwheat, that she did not exercise care, control, and custody of any of the contraband items found at that address during the search, and that she was not involved in the manufacture of methamphetamine on June 7, 2006. Oustad testified that she had moved out approximately a month before the search and was living in Buchanan Dam, Texas. Marty corroborated Oustad's testimony, stating that Oustad moved out one or two months before the June 7 search and that he did not begin manufacturing methamphetamine until the beginning of June. Oustad's testimony was also corroborated by Alan Mize, who lived in Buchanan Dam and claimed that Oustad lived there with him for approximately a month before she

---

[1] Because Marty Oustad shares the same surname as the appellant in this case, we will refer to him by his first name. We will continue to refer to the appellant as "Oustad."

was arrested and again for a few weeks after she was released from jail. Alan's wife, Dena Mize, also testifed that Oustad lived on their property in Buchanan Dam at some point during the summer of 2006, but Dena did not remember which month Oustad lived there.

In order to prove that Oustad still lived at the 809 Buckwheat address, the State relied on the testimony of two neighbors, Joyce McMillian and Kelly Tarpley. McMillian testified that Oustad's vehicle was at the address "every day, nearly." McMillian further testified that she saw Oustad and Marty there the morning of the search. According to McMillian, Oustad and Marty "were getting ready to go to work. They were getting in their cars." McMillian also testified that she regularly saw Oustad "mowing the yard, cleaning the yard, hoeing, picking weeds." Tarpley, McMillian's daughter, also testified to regularly seeing Oustad at the residence "mowing the grass, playing with the dogs, working on vehicles, just general stuff, coming and going to work." Tarpley said she had seen Oustad at the residence on June 6, the day before the search warrant was executed.

In addition, Officer Nichols testified that, as a result of his investigation, he had personal knowledge that Oustad lived at 809 Buckwheat.[2] Further, Officer Vaught testified that he

---

[2] At trial, the following exchange took place between the prosecutor and Officer Nichols:

Q: Now during your investigation who did y'all determine was residing at the residence where the warrant was served?

A: Marty Oustad—

[Defense Counsel]: Judge, I'm going to object to personal knowledge, hearsay.
The Court: Ask if he had personal—what he knows and how he has that opinion.

Q: Investigator Nichols, do you have personal knowledge of who was residing at that residence?

3

and Seargent Faison conducted surveillance on the house prior to obtaining the search warrant and that they observed Oustad and Marty there together. The State also introduced evidence of a prescription drug bottle that listed Oustad's name and the 809 Buckwheat address, which NET officers found in the home during the search.

The jury was presented with evidence of several pseudoephedrine purchases made by Oustad in the weeks prior to the search.[3] This evidence, in the form of pharmacy records, reflects that Oustad purchased thirty-four boxes[4] of cold and allergy medicine from three different pharmacies located in two different towns between January 12, 2006 and June 5, 2006. The records from the pharmacy Oustad visited on June 5 listed Oustad's address as 809 Buckwheat, and the pharmacy manager testified that the store's regular practice was to verify the customer's address by both checking the customer's driver's license and asking the customer to confirm that the address

---

A:      Two of them, yes.

Q:      And who is that?

A:      That was Marty Oustad and Laura Lynn Oustad.

[3] Texas law requires a store that sells over-the-counter medicine containing pseudoephedrine to keep the medicine behind the counter or in a locked cabinet. *See* Tex. Health & Safety Code Ann. § 486.013 (West Supp. 2008). Before selling such medicine, the store must require the customer to show photo identification and sign for the purchase. *Id.* § 486.014 (West Supp. 2008). The store is prohibited from selling more than two packages or six grams of pseudoephedrine in a single transaction. *Id.* The store must keep the records from sales of pseudoephedrine for at least two years. *Id.* § 486.015 (West Supp. 2008).

[4] After the trial court admitted records from two pharmacies showing thirteen purchases, Officer Nichols testified that the thirteen purchases reflected in the records involved twenty-six boxes or 38.3 grams of pseudoephedrine. Later in the trial, records from a third pharmacy were admitted into evidence showing six additional purchases that totaled eight boxes or at least 10.38 grams of pseudoephedrine.

on the driver's license was correct.  In addition, the State introduced evidence that Oustad gave her address as 809 Buckwheat when she was booked into jail on June 7.  Finally, the State introduced Marty's reports to his parole officer from May 16, 2006 and June 29, 2006, in which he stated that Oustad lived with him at the 809 Buckwheat address.[5]

Oustad admitted that she gave her address as 809 Buckwheat when she was booked into jail after her arrests for the offenses at issue in this case, but testified that she only did so because it was the address on her driver's license.  Oustad claimed that the reason she was regularly seen at the 809 Buckwheat address by McMillian and Tarpley was because Oustad and Marty's concrete business was operated out of that address.  Oustad testified she went to the home:

> Because I had animals, dogs that were mine that stayed there with [Marty] at the house.  I would go feed them.  And, plus, we had all of our material there, our form material and if I had to go pick up forms I would go there to the yard, pick them up, but I mean, that's it.

Oustad and Marty both testified that all of Oustad's pseudoephedrine purchases were for her sinus problems and that none of it was used for the manufacture of methamphetamine. Oustad claimed that she took two to three pills a night and testified, "I didn't really keep count of how many I bought whenever—I bought them when I needed them."  She further claimed that, when she made the June 5 purchase, the sales clerk simply took her address from her driver's license and did not ask her to confirm the address.

---

[5] Marty testified that he listed Oustad as living with him at 809 Buckwheat, because "when your wife runs off and leaves you when she's messing around on you, it's not nothing you want to write on paper, you know."

5

In four issues, Oustad challenges the legal and factual sufficiency of the evidence to sustain her convictions. Specifically, Oustad contends that the State did not sufficiently link her to the manufacture of the methamphetamine or the pseudoephedrine found during the June 7, 2006 search.

**STANDARD OF REVIEW**

In reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton*, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 235 S.W.3d at 778.

In reviewing the factual sufficiency of the evidence, we consider all the evidence in a neutral light, while giving due deference to the jury's determination. *See Sims v. State*, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). This involves a two-part inquiry. *See Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). We first look at the evidence presented in support of the guilty verdict and reverse only if the evidence "is so weak as to be clearly wrong and manifestly unjust." *Id.* at 11. If the evidence that tends to prove the verdict is sufficient standing alone, we then compare it with the evidence the defendant produces against the verdict, *id.* at 7, and reverse only if after the comparison the verdict

6

"is against the great weight and preponderance of the available evidence," *id.* at 11.[6] The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Vasquez*, 67 S.W.3d at 236. We may not reweigh the evidence and substitute our judgment for that of the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006); *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

## DISCUSSION

*Manufacture of Methamphetamine*

To prove the manufacture offense, the State had to prove that Oustad knowingly and intentionally manufactured methamphetamine in the amount of four grams or more but less than 200 grams.[7] *See* Tex. Health & Safety Code Ann. § 481.002(25) (West Supp. 2008) (defining manufacture), § 481.102(6) (West Supp. 2008) (listing methamphetamine as controlled substance), § 481.112(d) (creating offense of manufacture of controlled substance). The State could establish the manufacture offense either by showing that Oustad acted on her own to manufacture methamphetamine, or by showing that Oustad solicited, encouraged, directed, aided, or attempted

---

[6] The two-part inquiry "is the most equitable approach, especially given the fact criminal defendants are not under any obligation to present evidence on their behalf and usually rely, instead, on forcing the State to prove its case beyond a reasonable doubt." *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). The second part of the test is applicable "in the event a defendant does muster contrary evidence," giving the defendant a second ground for factual insufficiency. *Id.*

[7] The Department of Public Safety drug analyst who performed the tests on the evidence seized during the search testified that three of the items tested contained methamphetamine, together totaling 95.07 grams, including adulterants and dilutants. *See* Tex. Health & Safety Code Ann. § 481.112(d) (Manufacture offense "is a felony of the first degree if the amount of the controlled substance to which the offense applies is, by aggregate weight, including adulterants or dilutants, four grams or more but less than 200 grams.") The amount manufactured is not contested on appeal.

7

to aid Marty, with the intention of promoting or assisting Marty to manufacture methamphetamine. *See* Tex. Penal Code Ann. §§ 7.01-.02 (West 2003).[8]

In her first and second issues on appeal, Oustad argues that the evidence was legally and factually insufficient to prove that she manufactured methamphetamine because the State failed to sufficiently link her to the manufacturing. To obtain a conviction, "the State must link the defendant either to an interest in the place where the manufacturing was taking place or to the actual act of manufacturing." *Webb v. State*, 275 S.W.3d 22, 27 (Tex. App.—San Antonio 2008, no pet.); *see also East v. State*, 722 S.W.2d 170, 171-72 (Tex. App.—Fort Worth 1986, pet. ref'd). The purpose of the linking requirement is to prove the accused's knowledge and intent and thus protect the innocent bystander from conviction based on proximity to the laboratory. *See Isham v. State*, 258 S.W.3d 244, 248 (Tex. App.—Eastland 2008, pet. ref'd). The State may use circumstantial evidence to link Oustad to the manufacturing. *See Connor v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) ("A conclusion of guilt can rest on the combined and cumulative force of all incriminating circumstances."); *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977)

---

[8] Texas law provides that a person is criminally responsible as a party to an offense if the offense is committed by her own conduct, by the conduct of another for which she is criminally responsible, or both. *See* Tex. Penal Code Ann. § 7.01(a) (West 2003). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *See id.* § 7.02(a)(2) (West 2003). For a person to be guilty under the law of parties, the State must first prove the guilt of another as the primary actor. *Richardson v. State*, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993). Marty was convicted of possession and manufacture of methamphetamine and possession of pseudoephedrine with intent to manufacture as a result of the June 7, 2006 search. He testified at Oustad's trial regarding his conviction and admitted to operating the methamphetamine laboratory, though he denied that Oustad assisted him in the commission of the offense.

8

(under law of parties, "[p]articipation in an enterprise may be inferred from the circumstances and need not be shown by direct evidence"); *Webb*, 275 S.W.3d at 27 (manufacture can be established through circumstantial evidence).

Oustad claims that the only evidence the State introduced to link her to 809 Buckwheat—and by extension manufacture of the methamphetamine—was a single prescription bottle found in the home with her name on it. Oustad discounts the testimony of her neighbors, McMillian and Tarpley, as merely showing that she previously lived at the home, rather than that she still lived in and exercised control over the residence. Oustad notes that neither McMillian nor Tarpley testified to seeing Oustad inside the house and maintains that their testimony that they saw her outside the home the day before and the day of the search is consistent with her own testimony, and that of Marty and Alan, that she had moved a few weeks prior and only returned to the residence to retrieve materials for her work with the concrete company and to take care of her dogs.

The jury was presented with ample evidence from which it could draw a reasonable inference that Oustad still lived in and exercised control over the residence at 809 Buckwheat. The activities which McMillian and Tarpley observed Oustad performing—working in the yard and playing with the dogs—are typically those of a resident. Furthermore, Tarpley testified that she saw Oustad leaving for and returning from work—a pattern which is also consistent with Oustad living in the home. Officer Vaught also testified to observing Oustad at the home when conducting pre-search surveillance and Officer Nichols testified that he had personal knowledge that Oustad lived at 809 Buckwheat. In addition, the jury was presented with evidence that Oustad regularly gave her

9

address as 809 Buckwheat: she used the address on her driver's license, gave the address to three different pharmacies when purchasing pseudoephedrine, and gave the address to the Llano County jail when arrested for the offenses at issue in this case. This evidence, along with the prescription bottle with Oustad's name and the 809 Buckwheat address on it that officers found in the home, is sufficient to allow a reasonable jury to come to the conclusion that Oustad lived at 809 Buckwheat on the day of the search.

In response to the State's evidence, Oustad presented her own testimony and that of Marty, Alan, and Dena. The question of whether and how much to credit this testimony is one for the jury. *Johnson*, 23 S.W.3d at 7-9. An appellate court must respect the jury's determinations of what weight to give conflicting testimonial evidence "because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered," unlike the appellate court, which reviews a cold record. *Id.* at 8. We may not reverse simply because we would have resolved an apparent conflict in the evidence differently than the jury. *Watson*, 204 S.W.3d at 417. Instead, the "great weight and preponderance" of the record evidence must objectively contradict the jury's verdict before an appellate court can grant a remand of the cause. *Id.* Affording appropriate deference to the jury's view of the evidence, we hold that a reasonable jury could have chosen to disbelieve Oustad's testimony and that of her witnesses.

Marty, as Oustad's husband, was an interested witness. *See East*, 722 S.W.2d at 172 (holding that credibility of testimony from interested witnesses is matter for jury). He had already been convicted of manufacture and possession and had nothing to lose by taking full responsibility for the offenses. In his testimony, Marty admitted to manufacturing methamphetamine in 2001, as

10

well, and it is undisputed that Oustad lived with him there at the time. Further, Marty claimed that he purchased all of his own pseudoephedrine for his manufacturing lab and denied that Oustad or Anderson purchased any for him. Yet the jury was presented with evidence that both Oustad and Anderson made a significant number of pseudoephedrine purchases in the weeks and months leading up to the search—including the months of January through April when it is undisputed that Oustad lived at 809 Buckwheat— and could have viewed this as discrediting Marty's version of events.

Furthermore, each of the witnesses—Oustad, Marty, Alan, and Dena— was unclear on the time frame for when Oustad had moved out or how long before the search she had been living on the Mizes' property. Dena testified only that Oustad lived on their property "some time during that time" of June 7, 2006. Both Oustad and Alan first testified that she lived in Buchanan Dam for "about a month," then admitted on cross-examination that Oustad was living there on July 6, 2006, a month after the search and her arrest, then revised their testimony to say that she lived there for about a month before Oustad's arrest and then again for about a month after she was released from jail. Marty's testimony that Oustad had moved out one to two months before the search on June 7, and had not returned to the home after being released from jail is inconsistent with his reports to his parole officer—from May 16, 2006 and June 29, 2006—in which Marty stated that Oustad was living with him at 809 Buckwheat. Under the circumstances, a reasonable jury could have chosen not to credit the testimony of these witnesses. *See Johnson*, 23 S.W.3d at 7-9.

Even if the jury credited the evidence that Oustad no longer lived at the address, they could have found that she still had access to and control over the property. *See Webb*, 275 S.W.3d

11

at 27 (stating that "the State must link the defendant either to *an interest in the place where the manufacturing was taking place* or to the actual act of manufacturing" (emphasis added)). By Oustad's own testimony, she and her husband operated their concrete business out of the home. Oustad admitted to being at the home regularly for business purposes, as well as to feed and play with the dogs. In addition, NET officers observed Oustad at the home when conducting surveillance and McMillian and Tarpley testified to seeing Oustad on the premises consistently, including the day before and the morning of the search.

The fact that Oustad had access to and control of the property at 809 Buckwheat is not enough, by itself, to link her to the manufacture of methamphetamine. However, it is a circumstance tending to prove guilt that, when combined with other evidence, can be sufficient to prove guilt beyond a reasonable doubt. *See Webb*, 275 S.W.3d at 27.

In the case at bar, NET officers testified that they found diluted methamphetamine in liquid form, pseudoephedrine, iodine, and glass containers and other household items adapted for use in the manufacture of methamphetamine in plain view in the kitchen—and thus open and obvious to someone who, like Oustad, had a prolonged presence in the home. *See id.* (open location of lab tends to link accused to manufacture). In addition, the officers testified that the lab emitted a strong odor and McMillian testified that she often detected an odor of "burnt plastic" coming from the house. *See id.* ("open odor" tends to link accused to manufacture). Further, according to Officer Nichols, the laboratory included methamphetamine in different stages of manufacture—an indication that there were multiple methamphetamine "cooks" over a range of time. The combined force of this evidence is sufficient to create a reasonable inference that Oustad was not simply an

12

innocent bystander with no connection to the laboratory. *See Harris v. State*, No. 02-04-00202-CR, 2005 Tex. App. LEXIS 6179, at *3 (Tex. App.—Fort Worth Aug. 2, 2005, pet. ref'd) (mem. op., not designated for publication) (because of open and obvious nature of methamphetamine laboratories, "the fact that a defendant has a prolonged presence on the premises weighs more heavily against that defendant"); *see also Gilmore v. State*, No. 02-06-00302-CR, 2008 Tex. App. LEXIS 1935, at *6 (Tex. App.—Fort Worth Mar. 13, 2008, no pet.) (mem. op., not designated for publication) (finding link to location where manufacturing occurred where defendant in house for "at least the approximate hour" that police surveyed location).

Finally, Oustad's knowledge of and participation in the manufacture and possession can be reasonably inferred through her pseudoephedrine purchases. Over the course of five months, Oustad purchased at least thirty-four packages of cold and allergy medicine, containing at least 45 grams of pseudoephedrine.[9] Even if the jury credited Oustad's testimony that she took two to three pills a night every night—testimony that the jury was free to disbelieve—Oustad purchased significantly more pseudoephedrine than she would have taken in a five month period. The fact that Oustad traveled to three different pharmacies in two different towns to make her purchases also supports an inference that Oustad was not purchasing the pseudoephedrine for legitimate purposes. As noted above, some of the purchases were made during the months of January through April, when Oustad admitted living at 809 Buckwheat. Furthermore, Officer Nichol's testimony that the evidence indicated multiple "cooks" of methamphetamine could lead a reasonable jury to infer that the methamphetamine lab had been operated for some time before the search and was in operation

---

[9] *See* n.6, *supra*.

13

on June 6 and June 7, when Oustad was observed on the premises by McMillian and Tarpley. The combined force of this circumstantial evidence would allow a reasonable jury to conclude beyond a reasonable doubt that Oustad participated in the manufacture of methamphetamine.

Oustad argues that the pseudoephedrine purchases cannot be used to prove her guilt, claiming that the purchases are "extraneous acts" and thus were admitted only for the limited purpose of showing "intent, preparation, plan, knowledge, or absence of mistake." *See* Tex. R. Evid. 404(b). Each time the State sought to introduce evidence of Oustad's pseudoephedrine purchases, Oustad objected, arguing that they constituted evidence of prior bad acts and thus were inadmissible to show conduct in conformity with those prior acts. *See id.* However, the State responded, and the trial court agreed and correctly ruled, that purchases near the time of the search were res gestae. The trial court did rule that the purchases which were "more remote in time" could only be admitted for the limited purpose of showing intent, preparation, plan, knowledge, or absence of mistake. Rather than tell the jury which purchases were too remote in time—an act which the trial court viewed as impermissibly commenting on the weight of the evidence—the court included the following in the jury charge:

> In reference to evidence, if any, that the defendant has previously participated in recent transactions or acts, other than but similar to that which is charged in the indictment in this case, you are instructed that you can not [sic] consider such other transactions or acts, if any, for any purpose unless you find and believe beyond a reasonable doubt that the defendant participated in such transactions or committed such acts, if any; and even then you may only consider the same for the purpose of determining intent, knowledge, motive, common plan, or scheme if it does, and for no other purpose.

14

Even assuming arguendo that the jury was required to apply the limiting instruction included in the charge to all of the pseudoephedrine purchases, the evidence could still be used to show Oustad's intent and knowledge. This is precisely the purpose for which the State introduced the evidence. The State was required to link Oustad to the manufacture of methamphetamine in order to prove her knowledge and intent, thus protecting the innocent bystander who happens upon a laboratory. *See Isham*, 258 S.W.3d at 248 (affirmative links required to show that accused "knowingly and intentionally" manufactured methamphetamine). We hold that a reasonable jury could have reasonably inferred from Oustad's purchases that she knew about, prepared for, and intentionally participated in the manufacture of methamphetamine.

Although no direct evidence shows Oustad actively participated in the manufacture of methamphetamine, the State presented sufficient circumstantial evidence—including that Oustad was a regular presence at and exercised control over the residence where the drug was manufactured, that the laboratory was in an open and obvious location, that there was an obvious smell of methamphetamine manufacture, and that Oustad purchased more cold medicine than is consistent with personal use—to allow a reasonable jury to rationally infer and find beyond a reasonable doubt that Oustad manufactured methamphetamine. *See Clayton*, 235 S.W.3d at 778. Therefore, the evidence is legally sufficient to support the conviction.

Likewise, the State's evidence in support of the guilty verdicts is not so weak as to be clearly wrong and manifestly unjust. *Johnson v. State*, 23 S.W.3d at 11. Comparing the State's evidence to that Oustad produced against the verdict, and giving appropriate deference to the jury's determination of the weight and credibility of the evidence, we hold that the verdict is not against

15

the great weight and preponderance of the available evidence. *Id.*; *Watson v. State*, 204 S.W.3d at 417. Therefore, the evidence is factually sufficient to support the conviction.

We overrule Oustad's first and second points of error.

*Possession of Pseudoephedrine with Intent to Manufacture Methamphetamine*

To prove the possession offense, the State had to prove that Oustad exercised care, control, and management over the pseudoephedrine found during the search and that she did so with the intent to manufacture methamphetamine. *See* Tex. Penal Code Ann. §§ 481.002(38) (defining possession), .124(a)(2) (establishing offense of possession of immediate precursor with intent to manufacture). When the accused is not in exclusive control of the place where the substance is found, the State must link the accused to the substance through additional facts and circumstances. *See Evans v. State*, 202 S.W.3d 158, 161-62 (Tex. Crim. App. 2006); *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005).

In her third and fourth issues on appeal, Oustad argues that the evidence was legally and factually insufficient to prove that she exercised care and control over the pseudoephedrine. Here again, Oustad contends that the State failed to sufficiently link her to the pseudoephedrine that was found during the search. As with the manufacture offense, the State is required to link the accused to the possession in order to prove the accused's knowledge and intent and thus protect the innocent bystander from conviction based on proximity to the contraband. *See Evans*, 202 S.W.3d at 161-62. In other words, the State must introduce evidence that "generates a reasonable inference that the defendant knew of the contraband's existence and exercised control over it." *Nhem v. State*, 129 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The State may use

16

circumstantial evidence to link Oustad to the pseudoephedrinie. *See Connor*, 67 S.W.3d at 197 ("A conclusion of guilt can rest on the combined and cumulative force of all incriminating circumstances."); *Evans*, 202 S.W.3d at 162 (possession can be established through circumstantial evidence).

As discussed above, the State presented ample evidence to allow the jury to conclude that Oustad lived in, or at least had access to and exercised control over, the residence at 809 Buckwheat. *See Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981) (whether contraband "was conveniently accessible to the accused" is factor in linking accused to contraband); *Beall v. State*, 237 S.W.3d 841, 850 (Tex. App.—Fort Worth 2007, no pet.) (whether accused "owned or had the right to possess where the drugs were found" is factor in linking accused to contraband). The testimony of the neighbors, the observations of the NET officers, Oustad's regular use of the address when purchasing pseudoephedrine, Oustad's use of the address when being booked into jail for the offenses at issue, and Oustad's own testimony that she was regularly in the home for the concrete business and to care for the dogs are sufficient to link Oustad to the address. As with the manufacture offense, Oustad's access to the home is insufficient by itself to prove that she possessed the pseudoephedrine that was found in the home, but is a circumstance tending to prove guilt that, when combined with other evidence, can prove guilt beyond a reasonable doubt. *See Evans*, 202 S.W.3d at 162; *Poindexter*, 153 S.W.3d at 411.

In addition to linking Oustad to the address where the pseudoephedrine was found, the State also showed that the lab emitted a distinct and obvious odor and that the pseudoephedrine and other contraband were in plain view in the kitchen—factors which the court of criminal appeals

17

has held tend to link the accused to possession of the contraband. *See Evans*, 202 S.W.3d at 162 n.12; *Poindexter*, 153 S.W.3d at 409; *see also Beall*, S.W.3d at 850; *Nhem*, 129 S.W.3d at 699. The State also linked Oustad to the pseudoephedrine by showing that she purchased more pseudoephedrine in the weeks prior to the search than is consistent with personal use.[10] *Cf. Shaffer v. State*, 184 S.W.3d 353, 361 (Tex. App.—Fort Worth 2006, pet. ref'd) (possession of large quantity of cold medicine and manufacturing supplies tends to show intent to manufacture).

Although no direct evidence shows that Oustad exercised care, control, and management over the pseudoephedrine found in the home, the State presented sufficient circumstantial evidence—including that Oustad was a regular presence at and exercised control over the residence where the contraband was found, that the contraband was in an open and obvious location, that there was an obvious smell of contraband, and that Oustad purchased more cold medicine than is consistent with personal use—to allow a reasonable jury to rationally infer and find beyond a reasonable doubt that Oustad possessed the pseudoephedrine with the intent to manufacture methamphetamine. *See Clayton*, 235 S.W.3d at 778. Therefore, the evidence is legally sufficient to support the conviction.

---

[10] As with the manufacture offense, the State could use the pseudoephedrine purchases to link Oustad to the pseudoephedrine found during the search without violating the trial court's limiting instruction, under which the jury was to consider the evidence only for the purpose of determining Oustad's knowledge and intent. *See Evans v. State*, 202 S.W.3d 158, 161-62 n.9 (Tex. Crim. App. 2006) (affirmative links requirement is shorthand for requirement that State establish that possession is knowing); *Nhem v. State*, 129 S.W.3d 696, 699 (Tex. App.—Houston [14th Dist] 2004, no pet.) ("An affirmative link generates a reasonable inference that the defendant knew of the contraband's existence and exercised control over it.").

Likewise, the State's evidence in support of the guilty verdicts is not so weak as to be clearly wrong and manifestly unjust. *Johnson v. State*, 23 S.W.3d at 11. Comparing the State's evidence to that Oustad produced against the verdict, and giving appropriate deference to the jury's determination of the weight and credibility of the evidence, we hold that the verdict is not against the great weight and preponderance of the available evidence. *Id.*; *Watson v. State*, 204 S.W.3d at 417. Therefore, the evidence is factually sufficient to support the conviction.

We overrule Oustad's third and fourth points of error.

**CONCLUSION**

Because we hold that the evidence is both legally and factually sufficient to support the jury's verdicts, we affirm the judgments of conviction.

_____

Diane M. Henson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   April 9, 2009

Do Not Publish