**Leviyas Jamail CLAYTON, Appellant**

v.

**The STATE of Texas.**

**No. PD–1311–05.**

Court of Criminal Appeals of Texas.

Oct. 10, 2007.

---

**15.** *See id.* at 764.

Kurt B. Wentz, Houston, for appellant.

Bridget Holloway, Asst. D.A., Houston, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

KEASLER, J., delivered the opinion of the Court in which KELLER, PRICE, WOMACK, JOHNSON, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

A jury found Leviyas Jamail Clayton guilty of the murder of James Playonero. The Thirteenth Court of Appeals held that the evidence was legally insufficient to support the jury's verdict.[1] We disagree and reverse the judgment of the court of appeals.

### Facts

On June 14, 2001, Angela Davis, an employee with City of Houston Animal Control, stopped to render assistance when the truck in front of her veered off the road into a ditch near the entrance to Brock Park in Harris County, Texas. Her partner, who was following behind her in another car, also stopped. Approximately ten to twenty minutes after the truck veered off the road, Davis looked into the park and noticed something moving. She went to investigate and discovered James Playonero, covered in blood and suffering from several gunshot wounds. Davis called the police for help. Although Playonero attempted to speak to Davis, she could not understand what he was saying because he was mumbling. Playonero died before the ambulance arrived—approximately ten minutes after he was discovered. According to Davis, between the time she stopped to assist the driver of the truck that veered off the road and the time she went to investigate the movement in the park, she did not hear any gunshots or see any other people or vehicles.

Davis discovered Playonero near a 1995 Toyota Avalon, which Playonero had borrowed from a friend named Angel Ayala earlier that morning. The car appeared to have rolled into a tree and was stuck in the mud. The gear-shift was in neutral, and the ignition was in the accessory position. Police suspected that a tire iron found in the front seat of the car had been wedged against the accelerator so the car could propel itself into the trees. Based on the discovery of a wad of burned paper lodged in the gas manifold, police also concluded that someone had tried to set the car on fire by igniting the gas tank.

An assistant medical examiner with the Harris County Medical Examiner's Office testified that Playonero was shot at close range and that Playonero died within five to ten minutes after suffering the wounds. He also stated that, based on his training and experience, there was no possible way that Playonero could have lived for twenty

---

1. *Clayton v. State,* 169 S.W.3d 254, 255 (Tex. App.-Corpus Christi 2005).

to thirty minutes after receiving those wounds.

The evidence at trial showed that there was a significant amount of blood inside the car and a moderate amount on the outside of the car. A latent-fingerprint examiner with the Houston Police Department testified that he identified prints belonging to Playonero, Ayala, and Clayton. He testified that he identified three sets of prints, stamped in blood—one on the middle console, one on the gear shift, and one on the steering wheel. These prints belonged to Clayton. The prints identified as belonging to Playonero and Ayala were not bloody.

Sergeant Boyd Smith, one of the first homicide officers on the scene, testified that there were no witnesses at the park who saw Playonero get shot. Although bullet fragments were discovered in the car, there were no bullet holes inside the car. Sergeant Smith believed that Playonero was shot both in and outside the car and that the shooting did not take place in the park because there were no shell-casings found outside the car. He suspected that Playonero's murder involved a drug deal when he learned that Ayala and Playonero were Colombian and because of the nature of Playonero's gunshot wounds. Referring to the wounds, Sergeant Smith stated:

> The fact that he was shot in both legs, twice in both legs, once in the forearm, once through and through in the flesh and the stomach, shot in the penis, shot in the middle of the back of the neck, they were torturing him or trying to get information or getting information from something over a bad drug deal.

Jesus Sosa, an officer with the Homicide Division, was assigned to investigate Playonero's death. Clayton became the focus of his investigation based on the print identification. After Officer Sosa obtained an arrest warrant for Clayton in mid-July, he first attempted to find Clayton at his grandmother's house, which was located three to four miles from Brock Park. He also tried to locate Clayton at his girlfriend's apartment and the homes of various relatives. Despite Officer Sosa's efforts, Clayton was not arrested until he was stopped for a traffic violation in March 2002, some eight months later.

Explaining what his investigation revealed, Officer Sosa testified that he did not speak with any witnesses who saw Clayton in the park on June 14th or who witnessed Clayton shoot Playonero. He also testified that he did not interview any witnesses who could connect Clayton to Playonero.

Concurring with Sergeant Smith's opinion about why Playonero had been murdered, Officer Sosa testified that, based on his investigation, he believed that Playonero was conducting a drug transaction in the park and that the deal had "gone bad." During his investigation, Officer Sosa verified his initial suspicions about Playonero's involvement with drugs. He stated that Playonero's wife told him that Playonero was involved in the drug business and that he would disappear for several days at a time and return with money. In furtherance of his theory, Officer Sosa also referred to Playonero's wounds:

> The way he was shot, the manner in which he was shot, the wounds he received, to me somebody wanted to hurt him.
>
> . . .
>
> They didn't execute him. An execution is a gunshot wound to the head and that's it. This guy was hurt.
>
> . . .
>
> Not one of the wounds was a life-threatening injury. It's possible that the final or finishing touch to the back of the

neck was going to be the ultimate, but whoever shot him in the back of the neck messed that up too.

Finally, offering another factor that supported his theory, Officer Sosa pointed to the car, noting that it had been covered in blood.

Officer Sosa also testified that he eliminated Ayala as a suspect when he interviewed Ayala to determine his involvement. Ayala told Officer Sosa that he was at home alone when Playonero was shot.

The police never recovered a firearm linked to the shooting.

Clayton was the only defense witness. He testified that he went to the park on June 14th about a quarter before noon to meet a woman he had met at a nightclub two weeks earlier. Immediately before he entered the park, he saw a blue car exiting at a high rate of speed. He did not see any other cars in the park when he first arrived. But when he was half-way into the park, he noticed a white Avalon wrecked in front of a tree with the engine running and the rear passenger's door open. Clayton got out of his car and walked toward the car. He saw Playonero lying in the backseat covered in blood. With both hands, Clayton grasped Playonero's left hand for a few seconds and, in response, Playonero began to mumble but Clayton did not understand what he was saying. Clayton then got in the driver's seat, sat on the tire iron, and "tried to put the car in reverse, but the gravel around the car was—where the ground was wet and the mud was, the car wouldn't move." Although he tried to move the car two times, the tires just spun. During direct examination by his attorney, Clayton stated that he did not remember touching the console of the car but that he did remember touching the gear-shift handle and the steering wheel. According to Clayton, the gear-shift was in the drive position before

he moved it, and when the car would not move, he put the gear-shift in neutral and turned the engine off. Clayton then saw a truck veer off the road outside of the park; he panicked, got in his car, and left the park. As he left the park, he saw two animal control trucks parked behind the truck that veered off the road across the street. Clayton then headed to the house that he shared with his grandmother.

On cross-examination, the prosecutor challenged Clayton's testimony about his attempts to move the Avalon out of the mud:

Q [Prosecutor]. [Y]ou got the car in reverse. You're spinning the tires in the mud, and no mud gets thrown on that front fender; is that correct? You saw the picture. There's no mud on it?

A [Clayton]. There's no mud on that car in the picture.

Q. Now I want you to look at this picture again. You notice on this front tire that the mud is only half way kind of, almost half moon shape on the tire?

A. Yes, sir.

Q. And you said that when you first walked up to this car, it was stuck down in the mud, right? It was stuck?

A. Yes, sir.

Q. What we're looking at here, if that's the mud line, where the car was stuck in the mud on that tire.

Defense Counsel: Judge, I object. He's asking him to speculate again.

Prosecutor: He's there, Judge, he should know.

. . .

Court: All right. You give me a chance to rule. He can answer it if he knows.

Q [Prosecutor]. You see what I'm talking about right here, all the mud caked on the tire right there?

A. Yes, sir.

Q. That's the mud from where the car was stuck in the mud, right?

A. Yes, sir.

The prosecutor also questioned Clayton about why he left the park without telling either of the animal control officers about Playonero:

Q [Prosecutor]. You'd have to agree it's a pretty heinous crime, a pretty bad crime, right?

A [Clayton]. Yes, sir.

Q. And the man's still alive as you're leaving, right?

A. Yes, sir.

Q. And you can tell that it's serious life-threatening injuries, correct?

A. Yes, sir.

Q. And those animal control officers are right there. Can you help me? You don't go up to them?

. . .

A. Sir, I was scared. I just left.

Q. You were scared of the animal control officers?

A. I was scared when I heard the truck flip over. I didn't know what was going on, sir.

And when the prosecutor questioned him about whether he called 911 when he got home, Clayton admitted that he did not call and stated that he went to his room, sat on his bed for a while thinking about what he had seen, and cried for a few minutes. Although Clayton testified that he often confided in his grandmother, he stated the he did not tell her about what he had seen even though she was there

when he came home. Finally, when asked by the prosecutor if any of his family members told him that the police had a warrant for his arrest, Clayton stated that he did not know about the warrant until he was arrested during the traffic stop in March.

### Procedural History

The jury convicted Clayton of murder[2] and sentenced him to thirty years' imprisonment. Clayton appealed his conviction, claiming "that the evidence was legally and factually insufficient to prove he committed murder."[3] Without addressing Clayton's factual sufficiency claim, the Thirteenth Court of Appeals held that the evidence was legally insufficient, reversed the trial court's judgment, and entered a judgment of acquittal.[4]

Considering Clayton's bloody prints first, the court of appeals stated that the bloody prints "are not evidence that [Clayton] was with the victim before the shooting, and an inference to that effect can be reached only by first assuming that appellant was the perpetrator of the murder and then working backwards."[5] The court concluded that the prints only proved that Clayton was at the crime scene after Playonero was shot and that Clayton's presence after the murder is not enough to prove guilt.[6]

Next, the court noted that an individual's failure to notify law-enforcement officials about a crime is not enough to prove guilt.[7] The court then focused on proof of motive. While observing that motive is

2. TEX. PENAL CODE. ANN. § 19.02(b) (Vernon 1994).

3. *Clayton*, 169 S.W.3d at 255.

4. *Id.*

5. *Id.* at 258.

6. *Id.* (citing *Solomon v. State*, 49 S.W.3d 356, 361 (Tex.Crim.App.2001); *Medina v. State*, 7 S.W.3d 633, 641 (Tex.Crim.App.1999); *Miles v. State*, 918 S.W.2d 511, 515 (Tex.Crim.App. 1996)).

7. *Id.* (citing *Medina*, 7 S.W.3d at 641).

not an element of murder, the court stated that "when identity is called into question, as it is here, proof of motive might be the glue that holds the entire case together."[8] The court pointed to the absence of any evidence connecting Clayton to Playonero and then determined that drug-deal-gone-bad theory was unreliable, stating, "Such strained speculation is far too weak and attenuated a connection to prove a motive sufficient to establish beyond a reasonable doubt [Clayton's] identity as the murderer."[9]

We granted review to determine whether the Thirteenth Court of Appeals erred in its legal sufficiency analysis and erred in holding that the evidence was legally insufficient to support Clayton's murder conviction. We conclude that it did and remand this case to the court of appeals for consideration of Clayton's factual sufficiency claim.

## Law and Analysis

■■■ When we review a court of appeals's application of the legal sufficiency standard set out in *Jackson v. Virginia,*[10] "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[11] This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

facts to ultimate facts."[12] Therefore, in analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."[13] Our review of "all of the evidence" includes evidence that was properly and improperly admitted.[14] When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.[15] Direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."[16]

After a thorough review of the record and the opinion below, we hold that the court of appeals incorrectly applied the *Jackson* standard when considering the circumstantial evidence supporting Clayton's conviction. The court failed to properly consider the combined and cumulative force of the evidence and view the evidence in the light most favorable to the jury's guilty verdict. The court did not consider all of the evidence in its sufficiency analysis and, in conducting its cursory review of the evidence, the court improperly used a divide-and-conquer approach, systematically isolating and then discounting the evidence supporting Clayton's conviction. Giving proper deference to the jury's ver-

---

**8.** *Id.* (citing *Guevara v. State,* 152 S.W.3d 45, 50 (Tex.Crim.App.2004); *King v. State,* 29 S.W.3d 556, 565 (Tex.Crim.App.2000)).

**9.** *Id.*

**10.** 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**11.** *Id.* at 319, 99 S.Ct. 2781 (emphasis in original).

**12.** *Id.*

**13.** *Hooper v. State,* 214 S.W.3d 9, 16–17 (Tex. Crim.App.2007).

**14.** *Conner v. State,* 67 S.W.3d 192, 197 (Tex. Crim.App.2001).

**15.** *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781.

**16.** *Hooper,* 214 S.W.3d at 13.

dict, we find the evidence legally sufficient to sustain Clayton's conviction.

◼ The jury was presented with two conflicting theories-the State's and Clayton's. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial. And most importantly, the jury was able to assess Clayton's credibility and demeanor when he explained the presence of his bloody prints in the Avalon. From the guilty verdict, it is clear that the jury rejected Clayton's exculpatory explanation. With these things in mind, we consider the evidence in the light most favorable to the verdict.

◼◼ We begin with Clayton's bloody prints. When evaluating the legal sufficiency in burglary cases, we have said that "the fingerprints of an accused, which necessarily must have been made at the time of the burglary, are sufficient to sustain a conviction without further identification evidence." [17] In burglary cases, fingerprints constitute direct evidence of the ultimate fact to be proved—illegal entry.[18] In this case, the ultimate fact to be proved is the identity of Playonero's killer.[19] Clayton's bloody prints do not constitute direct evidence of the ultimate fact to be proved— that Clayton shot Playonero. The prints establish only that Clayton was at the crime scene some time after Playonero was shot. Therefore, the court of appeals correctly concluded that the prints, standing alone, do not sufficiently establish that Clayton shot Playonero. However, the prints constitute circumstantial evidence and, by considering the prints in isolation, the court failed to recognize their significance when considered with the remaining circumstantial evidence admitted at Clayton's trial.

In addition to establishing Clayton's presence at the crime scene after Playonero was shot, the bloody prints provide an additional, incremental piece of circumstantial evidence that support an inference that Clayton was the shooter. During the State's closing argument, the prosecutor used the quantity of bloody prints to discredit Clayton's explanation and further its trial theory. Directing the jury's attention to a photograph of Playonero's body, the prosecutor stated that Playonero's hands "were fairly clean." Reminding the jury that Clayton testified that he only grasped one of Playonero's hands, the prosecutor argued, "That's not enough blood on the man's hand to be able to leave it behind to be able to leave that many prints. And to leave that much blood on the center console, gear shift, door, didn't happen." In considering the evidence relied on by the prosecutor, a rational juror could infer that Clayton lied about the extent of his involvement with Playonero and therefore lied about his involvement in Playonero's death. And, when considered with Sergeant Smith's testimony about the unlikelihood that Playonero was shot at the crime scene, a juror could rationally infer that, in order to dispose of the evidence, Clayton drove Playonero to the park in the Avalon after he was shot. Indeed, such an inference would be consistent with Davis's statement that she did not see any vehicles leave the park when she was assisting the driver of the truck outside of the park's exit as well as the medical examiner's testimony that Playonero would be able to live for only five to ten minutes after sustaining the gunshot wounds.

---

17. *Phelps v. State,* 594 S.W.2d 434, 435 (Tex. Crim.App.1980) (quoting *Dues v. State,* 456 S.W.2d 116, 117 (Tex.Crim.App.1970)).

18. *Eiland v. State,* 509 S.W.2d 596, 598 (Tex. Crim.App.1974).

19. *See id.*

We have recognized that a factfinder may draw an inference of guilt from the circumstance of flight.[20] Clayton's flight from the park, which the court of appeals failed to consider, constitutes an additional piece of incriminating circumstantial evidence. And, in this case, an inference of guilt based on flight was heightened by the obvious conflict between Clayton's stated reason for fleeing the park and his explanation accounting for the presence of the bloody prints. Although the court of appeals accurately determined that Clayton's failure to inform authorities about Playonero is not enough to establish guilt,[21] the court disregarded this circumstance as it related to the incongruity between Clayton's testimony accounting for the bloody prints and his flight. Explaining the presence of his prints, Clayton testified that, after discovering Playonero bloody in the backseat of the car, he was concerned and tried to move the car to get help for Playonero. Clayton stated that he spent two minutes trying to remove the car from the mud but that he was unsuccessful because the tires would spin in the mud. Yet, contrary to his stated objective, Clayton testified that he quickly abandoned his efforts to help Playonero:

Q [Prosecutor]. You hear the crash, what do you do?

A [Clayton]. I get in my car and leave.

Q. What about the man in the backseat of the car? Did anyone help him?

A. I was trying to help him; but when I heard the truck flip over, I didn't know what to do.

Q. You're going to leave the park to go get him help?

A. I was just trying to get away, sir. Get away from there, that's it.

Q. So you had decided to stop helping this man and you're just leaving. You're done with it. You can't get the car out. You're on your own, Buddy, I'm leaving; is that correct?

A. Yes, sir.

Clayton also admitted that he failed to stop and tell the animal-control officers about Playonero even though they were just across the street from the park's exit assisting the truck driver. Indeed, Clayton conceded that he failed to call 911 or notify anyone about Playonero after he left the park. In short, Clayton's sudden flight does not comport with Clayton's "Good Samaritan" explanation for the presence of the prints. Additionally, Clayton's "Good Samaritan" explanation was also inconsistent with evidence showing that there was no mud thrown on the front fender of the Avalon. Therefore, a rational juror considering Clayton's explanation could draw a strong inference of guilt based on his flight from the park.

Similar to flight, although a marginally less inculpatory piece of circumstantial evidence, is Clayton's failure to turn himself into police on the arrest warrant. The warrant was issued eight days after Clayton was identified through the bloody prints. Officer Sosa testified that he and his partner tried to locate Clayton over the course of a week after the warrant was issued. He testified that he informed Clayton's grandmother, mother, girlfriend, and father's girlfriend about the warrant. He also stated that Clayton's attorney contacted his partner on July 30th about the warrant. Clayton denied knowing about the warrant until he was arrested the following March, eight months after the warrant was issued. When the prosecutor

20. *Hardesty v. State,* 656 S.W.2d 73, 78 (Tex. Crim.App.1983); *Jones v. State,* 481 S.W.2d 900, 902 (Tex.Crim.App.1972).

21. *Clayton,* 169 S.W.3d at 258.

asked Clayton where he had been during the eight months, Clayton said he had been at his grandmother's house, mother's house, father's house, and girlfriend's house. A rational juror considering this evidence, could infer that Clayton knew about the warrant and intentionally avoided apprehension. As with the circumstance of flight, under the specific facts of this case, a juror could reasonably draw an inference of consciousness of guilt based on Clayton's failure to turn himself into authorities.

 When considering motive, the court of appeals correctly recognized that although motive is not an element of murder,[22] it may be a circumstance that is indicative of guilt.[23] Noting that there was no evidence connecting Clayton to Playonero, the court stated that Officer Sosa's theory that the murder was drug-related because of Playonero's involvement in dealing drugs did not "prove a motive sufficient to establish beyond a reasonable doubt" that Clayton shot Playonero. In reaching this conclusion, however, the court failed to acknowledge all of the circumstantial evidence that supported the State's theory that Playonero's murder was drug-related.

The State's theory rested on more than Officer Sosa's testimony about Playonero's involvement with drugs. Drawing on his training and experience, Officer Sosa opined that, based on his investigation and his review of the crime scene photos and the autopsy report and photographs, Playonero's murder was likely drug-related. In offering his opinion, Officer Sosa emphasized the nature of Playonero's wounds, the fact that Playonero was left for dead, the fact that the car was covered in blood,

and the fact that someone tried to burn the car in an effort to destroy evidence. Sergeant Smith offered the same opinion. Based on his training and experience, his investigation at the park, the nature of Playonero's wounds, and the fact that Playonero was Colombian, Sergeant Smith theorized that it was a drug-related killing. A juror considering the testimony of Officer Sosa and Sergeant Smith could rationally infer that Playonero's murder was drug-related. Even though the court of appeals gave short-shrift to the circumstantial evidence supporting the State's theory, its ultimate conclusion about the evidentiary value of the proof of motive was correct. Because there was no evidence of a prior relationship between Clayton and Playonero and no evidence that Clayton was involved with drugs, the circumstantial evidence of motive was insufficient to establish Clayton's identity as Playonero's killer; it only provided the jury with an explanation for Playonero's death. As a result, a juror weighing this evidence could not rationally draw an inference of guilt from this evidence alone.

Finally, we consider the timing of the events surrounding Playonero's death. As stated above, Clayton's own testimony, together with his bloody prints, establish that he was with Playonero in the park after Playonero was shot. Clayton testified that he was with Playonero for at least two to three minutes after Playonero was shot. Referring to Playonero's neck injury, the medical examiner testified: "I think that five to ten minutes would be the outer limit of how long [Playonero] would have been able to survive this type of injury." Davis testified that Playonero

22. *Id.* (citing *Ates v. State,* 21 S.W.3d 384, 390 (Tex.App.-Tyler 2000, no pet.); *Reeves v. State,* 969 S.W.2d 471, 479 (Tex.App.-Waco 1998, pet. ref'd)).

23. *Id.* (citing *Guevara v. State,* 152 S.W.3d 45, 50 (Tex.Crim.App.2004); *King v. State,* 29 S.W.3d 556, 565 (Tex.Crim.App.2000)).

died in her arms approximately ten minutes after she discovered him, which was approximately fifteen to twenty minutes after the truck veered off the road. She stated that she did not see anyone enter or leave the park and did not hear any gunshots while she was assisting the truck driver. She also testified that she did not see anyone else in the park when she discovered Playonero.

In resolving the conflicting testimony offered by Davis and the medical examiner about how long Playonero survived after being shot, a rational juror could reasonably place Clayton in Playonero's presence at the time of the shooting. Playonero had, at most, a survival time of ten minutes after he was shot in the neck. Given Davis's testimony that Playonero lived for some time after she discovered him and the evidence indicating that no one other than Clayton was with Playonero during the final minutes of his life, it is rational to infer that Clayton was with Playonero when he was shot. And when considered with the combined and cumulative force of the incriminating circumstantial evidence discussed above, we hold that a rational juror could find, beyond a reasonable doubt, that Clayton was responsible for killing Playonero.

After reviewing the evidence under the *Jackson* standard, we hold that the evidence is legally sufficient to support the jury's guilty verdict.

### Conclusion

Because we hold that the court of appeals erred in holding that the evidence was legally insufficient to support Clayton's conviction for murder, we reverse the judgment of the court of appeals and re-

mand this case so the court can consider Clayton's factual sufficiency claim.[24]

MEYERS, J., did not participate.

24. *Watson v. State*, 204 S.W.3d 404 (Tex. Crim.App.2006).