*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*




## MEMORANDUM OPINION

No. 04-09-00520-CV

## IN THE MATTER OF E.A.

From the County Court at Law, Val Verde County, Texas
Trial Court No. J-08-69
Honorable Sergio J. Gonzalez, Judge Presiding

Opinion by:     Steven C. Hilbig, Justice

Sitting:       Catherine Stone, Chief Justice
               Sandee Bryan Marion, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:  October 13, 2010

AFFIRMED

A jury found that E.A. engaged in delinquent conduct by committing the offense of arson. The trial court committed E.A. to the Texas Youth Commission ("TYC"). On appeal, E.A. contends: (1) the evidence is legally insufficient to support the jury's finding that E.A. engaged in delinquent conduct; and (2) the trial court abused its discretion in committing E.A. to TYC. We affirm.

**BACKGROUND**

At trial, Pablo Padilla, the assistant fire chief for the City of Del Rio and its fire marshal, testified he investigated a brush fire that eventually consumed three homes.[1] When Padilla arrived at the scene of the fire on February 13, 2008, the county fire chief told him that somebody had mentioned seeing three or four juveniles leaving the area at the time the fire started; however, Padilla was unable to verify this information or locate the person who provided the information. The following day, Padilla returned to the scene and identified the general location where the fire originated. Padilla continued going back to the neighborhood and asking questions of the residents until an individual informed him that some juveniles had been stopped in the middle of a school day, and two of the juveniles were apprehended. Padilla determined that Monique Tovar was one of the apprehended juveniles and he interviewed her. Tovar provided him with information linking E.A. with the fire. Padilla confirmed E.A. was not in school on the day of the fire. Padilla then attempted to locate E.A. to question him; however, he had difficulty finding him. When Padilla finally located E.A., E.A. told Padilla that he did not know anything about the fire. Padilla continued his investigation and about one month later re-interviewed E.A. During this interview, E.A. admitted he was present at the fire scene, but he "didn't do anything."

After additional time had passed, Padilla was able to obtain a written statement from E.A. that was admitted into evidence. In his statement, E.A. stated he was smoking while walking to a friend's house. When he finished smoking, he threw his cigarette into some cut down cane and noticed the cane caught on fire. E.A. stated that he tried to put out the fire by stomping on it. When the fire would not stop, E.A. panicked and ran to a friend's house. E.A. identified the

---

[1] E.A. was also charged with three counts of criminal mischief relating to the destruction of the homes. However, the State abandoned these counts during trial after some evidence was presented concerning these charges.

friend as "Oscar." Upon arriving at Oscar's house, Oscar asked E.A. why his heart was beating so hard. E.A. told Oscar what happened, and Oscar told him not to tell anyone. E.A. stated that as he was returning home, he saw the emergency crews trying to put the fire out. Based on comments in E.A.'s statement, Padilla testified he determined the route E.A. took when fleeing from the fire scene. However, despite a canvass of the neighborhood Padilla could not locate "Oscar."

On cross-examination, Padilla stated that he believed E.A's written statement to be true at the time he took the statement. Padilla also stated that he still believed the statement was true. In response to whether Padilla believed E.A.'s intention was to start a fire, Padilla responded that he did not know what E.A.'s intention was at that time. Padilla stated that he recalled having previously told E.A.'s attorney that he knew E.A. did not mean to start a fire. However, Padilla further testified that when an officer, who had arrested E.A. on an unrelated charge, called and asked if Padilla wanted E.A. charged with arson, Padilla said yes. Padilla also testified that forty percent of the area where the fire originated was dirt.

Monique Tovar testified she attended school with E.A. and E.A. told her that he threw a cigarette and started the fire.

A jury found that E.A. engaged in delinquent conduct by committing the offense of arson, and the trial court committed E.A. to TYC.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, E.A. contends the evidence is legally insufficient to support a finding that he intended to destroy or damage vegetation on open land. E.A. contends the evidence established that he started the fire accidentally.

The criminal standard of review for legal sufficiency of the evidence applies to juvenile cases. *In re C.J.*, 285 S.W.3d 53, 55 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *In re J.B.M.*, 157 S.W.3d 823, 826 (Tex. App.—Fort Worth 2005, no pet.). To decide whether the jury's finding is supported by legally sufficient evidence, we consider all the evidence in its most favorable light to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *In re K.T.*, 107 S.W.3d 65, 71 (Tex. App.—San Antonio 2003, no pet.). The same standard applies to both direct and circumstantial evidence cases. *In re C.J.*, 285 S.W.3d at 55. "We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact." *Id.*; *see also In re J.B.M.*, 157 S.W.3d at 826. "When performing a legal sufficiency review, we may not sit as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the fact finder." *In re J.B.M.*, 157 S.W.3d at 826. "Instead, as a reviewing court, we only ensure the jury reached a rational decision." *Id.*

Relevant to the petition filed in this case, a person commits an offense if the person starts a fire, regardless of whether the fire continues after ignition, with intent to destroy or damage any vegetation, fence, or structure on open-space land. TEX. PENAL CODE ANN. § 28.02(a)(1) (West Supp. 2010). E.A. contends that the state failed to prove he intentionally started the fire. A person acts intentionally when it is his "conscious objective or desire" to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West Supp. 2010). Intent may be inferred from the acts, words, and conduct of the defendant. *Guevarra v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). However, in an arson case intent may not be inferred from the mere act of burning. *Beltran v. State*, 593 S.W.2d 688, 689 (Tex. Crim. App. 1980).

A jury may draw an inference of guilt from the defendant's flight from the scene of the crime. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007). Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances from which guilt may be inferred. *Guevara v. State*, 152 S.W.3d at 50; *see also In re C.M.G.*, 180 S.W.3d 836, 838-39 Tex. App.—Texarkana 2005, pet. denied) (reviewing court could look to juvenile's actions before, during, and after the commission of the offense to determine intent to kill baby).

In this case, the jury could infer E.A.'s intent to damage or destroy vegetation on open land based on the following facts: (1) E.A. admitted throwing the cigarette into the cane instead of on the dirt areas which covered 40% of the location where the fire originated; (2) E.A. did not report the fire but left the scene knowing that he had started a fire; (3) E.A. initially told Padilla he had no knowledge about the fire; (4) E.A. later admitted he was present at the fire scene but "he didn't do anything;" (5) E.A. changed his story a third time when he admitted to starting the fire, and (6) Padilla could never locate "Oscar," to whose house E.A. had allegedly run. Based on all of the evidence, the State presented sufficient evidence from which a reasonable jury could infer that E.A. had the intent to damage or destroy vegetation on open land. *See Clayton*, 235 S.W.3d at 780; *Guevara*, 152 S.W.3d at 50. E.A.'s first issue is overruled.

### COMMITMENT TO TYC

Before ordering a juvenile commitment to TYC, the juvenile court must find that: (1) placement outside the home is in the juvenile's best interests; (2) reasonable efforts were made to prevent or eliminate the need for removal from the home; and (3) the juvenile, in the juvenile's home, cannot be provided the quality of care and level of support and supervision the juvenile needs to meet the conditions of probation. TEX. FAM. CODE ANN. § 54.04(i)(1) (West Supp.

2010). A trial court's order committing a juvenile to TYC "must be reviewed under an abuse of discretion standard divorced from legal and factual sufficiency standards." *In re K.T.*, 107 S.W.3d 65, 67 (Tex. App.—San Antonio 2003, no pet.). "[T]he abuse of discretion standard requires that we 'view the evidence in the light most favorable to the trial court's ruling,' affording almost total deference to findings of historical fact that are supported by the record." *Id.* at 75 (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). "However, when the resolution of the factual issue does not turn upon an evaluation of credibility and demeanor, we review the trial court's determination of the applicable law, as well as its application to the appropriate law to the facts it has found, de novo." *Id.* A juvenile court is not required to place a juvenile on probation as a precondition to a commitment to TYC. *In re C.C.*, 13 S.W.3d 854, 859 (Tex. App.—Austin 2000, no pet.).

Two case histories prepared by the probation department were admitted into evidence at the disposition hearing. Those documents relate that E.A. was detained on June 18, 2008, for the arson offense and for two offenses of possession of marijuana in a drug-free zone. The possession offenses occurred on May 21, 2008, and June 18, 2008, respectively — each after the date of the arson. E.A. was released from detention on September 30, 2008. On October 15, 23, and 28, 2008, E.A.'s urinalyses tested positive for marijuana. On October 28, 2008, E.A. was again detained for violating the conditions of his release based on the positive drug tests. On July 2, 2009, the day after the jury reached its verdict on the arson offense, E.A. again tested positive for marijuana use. E.A. also had a previous referral for evading arrest or detention in 2007.

One case history report indicates that E.A.'s father was deported to Mexico in 2005 for possession of a controlled substance and family violence. E.A.'s mother had knee surgery on

both of her knees and is considered disabled. E.A.'s twenty-nine-year-old brother graduated from high school and resides in Arizona. E.A.'s twenty-seven-year-old brother dropped out of high school in 11th grade, had a juvenile record, but did not reside with E.A.'s mother. E.A.'s twenty-one-year-old sister dropped out of high school in 11th grade, was incarcerated, and was then placed on probation for transporting drugs. One of the case histories states that E.A.'s sister resides on her own. In the case history, E.A.'s mother reported that the family gets along well and spends good times together.

Josue Venegas, E.A.'s probation officer, testified that E.A. was released from detention on September 30, 2008, after he pled true to the two possession offenses. E.A. signed a document setting forth the conditions of his release and supervision. The supervision ended six months later on March 30, 2009. During the period of time he was on supervision, Venegas testified that E.A.'s mother reported that E.A. "was hanging around bad people that were making bad decisions." Venegas stated that E.A's school attendance was poor, and E.A. was unable to make up the school work he missed while absent. E.A.'s mother never asked Venegas for advice regarding how to obtain additional assistance for E.A. with his school work. The case histories indicated that the 2008-2009 school records showed that E.A. was to be retained as a 2nd year 9th grade student for the 2009-2010 school year.

On cross-examination, Venegas stated that the supervision from September of 2008 through March of 2009 was informal supervision. Venegas acknowledged that E.A.'s mother had reported that the family gets along well and that E.A. listens to her and helps with chores. Venegas further acknowledged that E.A. underwent urinalysis twenty-two times between July 2, 2008, and March 26, 2009, and tested positive only three times during the month of October of 2008. During the supervision, E.A. visited Venegas's office every day and made every visit

accompanied by his mother.  Venegas testified that he had visited E.A.'s home, and the home was clean and appropriate for a child.  While on informal supervision, E.A. appeared to keep his curfew hours except E.A. was not present during one visit.  After further reviewing the school records, Venegas stated that some of E.A.'s absences were on dates he was required to attend court; however, Venegas subsequently clarified that juveniles who attend court are asked to return to school rather than missing the entire day.  Venegas also acknowledged that under the Progressive Sanctions Model, local intensive supervision was recommended for E.A.'s level 4 offense.  Venegas recommended TYC for E.A. due to the seriousness of the offense and his prior history.

Lupita De La Paz, the director of the Casa De la Cultura, testified that the Casa is a non-profit organization that offers programs for at-risk youth.  Sometime during the summer of 2009, E.A. volunteered at the Casa's multi-media project and was working on an anti-drug commercial.  De La Paz stated that she visited E.A.'s house and met his sister.  E.A.'s mom appeared very supportive of E.A., who was very respectful towards his mother.  De La Paz testified that E.A. would be able to continue the classes and work at the Casa if he were placed on probation.  De La Paz stated that E.A. was the type of child who would be able to succeed on probation.  On cross-examination, De La Paz stated that she would be surprised if E.A. had stated that the reason he continued to smoke marijuana in July of 2009 was because he was not on probation.

Luz Lascano had known E.A. for over ten years.  During the summer of 2009, E.A. was hired for a summer youth program; however, E.A. was unable to continue with the program because his court dates prevented him from being present at the program every day.  Lascano stated that E.A. had applied for other jobs and told her he wanted to pay back the community for what he did.  Lascano testified that E.A.'s mother would be able to provide him with the support

necessary to succeed on probation. Lascano testified that she believed programs would be available to E.A. if he were placed on probation.

Paula Corona is a neighbor of E.A. Corona testified that she never any problems with E.A.

Angelica Reyes had been a service provider for E.A.'s mother for about fourteen months. Reyes testified that E.A. is respectful towards his mother. Reyes stated that E.A. is cooperative with his mother and helps around the home when asked. Reyes testified that E.A.'s mother is able to control and discipline E.A.

E.A.'s mother testified that if E.A. were placed on probation, she would ensure that he reported to the probation department as required. E.A.'s mother would continue to supervise him and ensure that he attended school. E.A.'s mother was unaware that E.A. had tested positive on July 2, 2009; however, when she learned of the results, she immediately contacted a program that helps youth with drug addiction and drug use. E.A.'s mother stated that if E.A. were placed on probation, she would continue to ensure that he attended drug programs. E.A.'s mother testified that E.A. obeyed her and treated her with respect. On cross-examination, E.A.'s mother was told that E.A. was immediately informed that he failed the drug test on July 2, 2009; however, E.A.'s mother testified that E.A. had not told her about the results.

In announcing the disposition, the trial court stated it considered E.A.'s history as it relates to detention hearings and the evidence presented, including the positive urinalysis tests. The positive test results occurred both while E.A. was on supervision and after he was released from supervision. The last positive test result occurred the day after the jury found that E.A. engaged in delinquent conduct. The trial court also considered the nature of the offense and the need to protect the public. Although E.A.'s mother provided assurances to the court she would

provide appropriate supervision, the evidence reflects E.A. has engaged in repeated offenses while under her supervision. Having reviewed the record, we cannot conclude that the trial court abused its discretion in ordering E.A. committed to TYC.

## CONCLUSION

The trial court's orders are affirmed.

Steven C. Hilbig, Justice