**Affirmed and Memorandum Opinion filed April 17, 2012.**



**In The**

# Fourteenth Court of Appeals

### NO. 14-11-00178-CR

**DAVID NICOL PENALOZA-GARCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1233147**

## MEMORANDUM OPINION

A jury convicted appellant David Nicol Penaloza-Garcia of murder, and the trial court sentenced him to forty-eight years' confinement in the Institutional Division of the Texas Department of Criminal Justice. In a single issue, appellant challenges the sufficiency of the evidence to support his conviction. We affirm.

### BACKGROUND

In June 2009, the body of Fernando Carranza was discovered shot to death near a warehouse located in the southeast Houston area. Houston Police Department ("HPD")

officers were called to the scene by the individual who discovered the body. Carranza had a great deal of facial trauma and no identification on his person; he was identified the next day by the medical examiner through his fingerprints. The officers determined that Carranza had been murdered. There was little evidence at the scene to suggest a suspect.

The next day, the decedent's family provided police with his cell phone. An employee of a local Mexican restaurant had discovered it in the men's restroom toilet tank. The employee answered the cell phone when one of the decedant's relatives called. Family members of the decedent retrieved the cell phone from the employee and took it to a local HPD substation. There they were directed to deliver the cell phone to the Homicide Division of the HPD. HPD Sergeant Padilla, the investigating officer, spoke to the decedent's family and reviewed the cell phone. He found that appellant was the last person to speak with the decedent on the cell phone. He also discovered several text messages exchanged between the decedent and appellant the day of the murder, setting up a time to meet so that appellant could repay the decedent a $1,500 debt.

Because appellant was the last person to have spoken with the decedent via the decedent's cell phone, Padilla attempted to contact appellant. He discovered that appellant had "fled" to Mexico. However, appellant contacted Padilla from Mexico shortly thereafter. He spoke with Padilla on the phone for about fifteen to twenty minutes in an unrecorded conversation. Padilla and appellant again spoke on the phone a few days later. This phone conversation was recorded. Finally, Padilla spoke with appellant about a month later in the Frio County Jail, where appellant was being held on unrelated charges.

During these conversations, appellant described the following events. He stated that he had picked up the decedent on the evening of the murder. Appellant was driving a white construction-type van. The decedent was accompanied by someone whom appellant did not know called "El Mocho." Appellant, the decedent, and El Mocho drove to the warehouse location where the decedent's body was later discovered. Appellant had brought a shotgun to give to the decedent in lieu of money to repay the debt. The decedent looked at the gun. Someone, either the decedent or El Mocho, loaded the

shotgun with shells that were not appellant's. The decedent stepped out of the van, but appellant stayed in the van. El Mocho moved to the back of the van and opened the rear doors.

Appellant, who had remained in the van in the driver's seat, heard the decedent and El Mocho begin arguing about splitting up money and about a drug transaction. He looked out of the van and saw what appeared to him to be drugs wrapped in brown paper and a substantial amount of money. The decedent was demanding a larger portion of the money. Suddenly, appellant heard a shotgun blast. He ran through to the back of the van, past El Mocho who was holding the shotgun, and grabbed the decedent and tried to "stand him up." El Mocho instructed appellant to take the decedent's keys from him, so appellant lifted the decedent's shirt and found his keys in one of his pockets. El Mocho then ordered appellant to get back into the van and drive away.

Once appellant obeyed, El Mocho directed him to a location near some apartments. El Mocho got out of the van, told appellant that if he ever told anyone what had happened, he would kill him, took the shotgun, and left. Appellant received a phone call from his brother shortly after these events. His brother asked him to pick up some food on his way home. Appellant drove to the Mexican restaurant where the decedent's phone was later discovered. He picked up the decedent's phone from inside his van and took it into the restaurant with him. He went into the bathroom to wash his hands and, not knowing what to do with the decedent's phone, he left it by the bathroom sink. He placed an order for food, then waited and watched part of a soccer match while the food was prepared. Once the food was ready, appellant took it home to his brother. He then went to bed.

After speaking with another brother from California who advised him to leave, appellant departed for Mexico the next day. He told Padilla that the reason he was going to Mexico was that members of the decedent's family were threatening both him and his family. He explained that he was concerned that he would be convicted of a crime he did not commit. However, he expressed a desire to come back and "clear his name."

Appellant also provided the details of his trip to Mexico. First appellant lied to his brother Javier to obtain his Javier's truck. Then, appellant lied to his girlfriend to persuade her to drive him to Mexico and drop him off. Specifically, appellant told his girlfriend that his father was ill and in the hospital. Further, according to appellant, before he left his girlfriend, he said, "[F]orgive me for what I've done, but please tell Fernando's family that I didn't do it."

After speaking with appellant, Padilla attempted to locate El Mocho, even running Crime Stoppers advertisements. Through law enforcement databases, Padilla discovered an individual who used the name El Mocho. He prepared a photographic array for appellant, including this individual's photograph, but appellant did not identify this person (or anyone else).[1] Additionally, Padilla discovered that parts of appellant's statements did not "line up" with what appellant's family members had told him. For example, appellant told Padilla that his brother, Javier, had been threatened by the decedent's family. However, Javier did not confirm any such threats.

Ultimately, appellant was charged with the murder of the decedent. At his jury trial, a medical examiner testified as to the cause of the decedent's death. Padilla testified regarding his investigation, described above. Appellant's statements were presented to the jury. One of the decedent's relatives testified regarding recovery of the cell phone, described above. Several other witnesses testified, including appellant's brother and nephew. Appellant's brother, Javier, testified that appellant told him El Mocho had killed the decedent. Appellant's nephew testified that he had observed the decedent using and selling drugs in the past. After hearing all the evidence and argument of counsel, the jury convicted appellant of murder. The trial court sentenced appellant to forty-eight years' confinement. This appeal timely followed.

---

[1] Padilla also interviewed this individual, but determined that he had nothing to do with the murder.

**SUFFICIENCY OF THE EVIDENCE**

In a single issue, appellant challenges the sufficiency of the evidence to support his murder conviction. When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the fact finder is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Our review considers both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). A person commits murder if he intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.02(b)(2) (West 2003).

Here, text messages between appellant and the decedent the day of the murder indicated that the decedent expected appellant to repay a debt that night. Appellant admitted that he was at the scene of the offense. He further admitted that the weapon used to kill the decedent was his. He acknowledged that he took the decedent's keys and his cell phone. He stated that he left the decedent's cell phone at a Mexican restaurant, and the cell phone was found at that location (although not precisely where appellant stated he left it). Appellant left for Mexico shortly after the offense occurred. Flight after the decedent's death is circumstantial evidence of guilt. *Smith v. State*, 355 S.W.3d 138, 147 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Finally, although appellant blamed El

Mocho for the murder, the jury was free to disbelieve that El Mocho was the shooter, was present at the scene, or even existed. *See Wesbrook*, 29 S.W.3d at 111.

From the evidence presented at trial, including appellant's statements, the jury could have inferred either that appellant shot the decedent or that an individual named El Mocho shot the decedent. "Faced with a record of historical facts that support conflicting inferences, the reviewing court must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010). Considering all the evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that appellant intentionally or knowingly caused the death of the decedent or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of the decedent. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.02(b)(2). Accordingly, we overrule appellant's sole issue.

## CONCLUSION

Having concluded that the evidence is legally sufficient to support appellant's conviction, we affirm the trial court's judgment.


/s/     Adele Hedges
            Chief Justice


Panel consists of Chief Justice Hedges and Justices Jamison and McCally.

Do Not Publish — Tex. R. App. P. 47.2(b).

6