# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00033-CR

**Paul Thomas Hughes, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF LAMPASAS COUNTY, 27TH JUDICIAL DISTRICT
NO. 8495, HONORABLE JOE CARROLL, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Following a bench trial, appellant Paul Hughes was convicted of misapplication of fiduciary property and misapplication of construction trust funds. *See* Tex. Penal Code Ann. § 32.45 (West 2011); Tex. Prop. Code Ann. §§ 162.031–.032 (West Supp. 2012). The trial court sentenced Hughes to five years' confinement for each offense, with the sentences to run concurrently. On appeal, Hughes asserts that the evidence is insufficient to support his convictions. We will affirm the trial court's judgments of conviction.

## BACKGROUND

In March of 2007, Hughes and Matthew Harton entered into a limited liability company agreement (the "LLC Agreement") to form Hughes-Harton Construction, LLC ("Hughes-Harton"). Under the terms of the LLC Agreement, Harton and Hughes each owned fifty percent of the company. According to Harton, the company primarily "poured foundations and [built] metal

buildings" of various sizes. Harton was initially the "construction manager" for Hughes-Harton, during which time he solicited potential jobs, prepared bids, and oversaw the purchasing and payment for construction expenses. Hughes "wanted to be in the field," and he initially was responsible for the on-site management of Hughes-Harton's various projects.

Harton would later testify that he was comfortable with Hughes-Harton's operations for the first few months, but then the company's performance began to decline. According to Harton, Hughes and other employees were not paying sufficient attention to detail on job sites, and Hughes began returning to the office in the afternoon "and would already be drinking." Hughes also began dating his future wife, Shawnda Hughes, during this time.[1]

In late 2007, Hughes-Harton was awarded a contract by the Lower Colorado River Authority ("LCRA") for the construction of two buildings in a recreation area on Lake Travis (the "LCRA Project"). Hughes-Harton began the LCRA Project in January of 2008, and the company submitted pay requests to LCRA as it completed various stages of construction. Hughes-Harton ultimately received $375,000 for the LCRA Project, of which $125,000 was expected to be profit.

In the "first of the year" of 2008, Hughes placed various Hughes-Harton documents into the company's filing cabinets and then had the locks on the filing cabinets changed. Hughes also changed the access codes to Hughes-Harton's bank accounts, and Harton could no longer view the company's accounts online. Then, Hughes hired Shawnda to be Hughes-Harton's bookkeeper and ceased using the independent accounting firm the company had employed. Hughes took the company checkbook from Harton and "turned it over to" Shawnda, and Shawnda became responsible

---

[1] For clarity, we will refer to Shawnda Hughes by her first name.

for managing the company's finances. Harton was not notified of or consulted on any of these changes, and he would later testify that his relationship with Hughes became very strained during this time.

In March of 2008, Hughes called Harton and told him he wanted to have a meeting the following morning. Hughes instructed Harton to bring his office keys, his truck keys, and his company phone because Harton "was pretty much done with the company." Harton would later testify that Hughes was "very confrontational on the phone," so the next morning Harton returned the company truck to the office but avoided speaking to Hughes. Hughes called Harton and said "It's done. You didn't show up. We're done. I owe you nothing and you're not going to get any [sic]."

In April of 2008, Harton and Hughes had a meeting with counsel in which they negotiated the dissolution of Hughes-Harton.[2] The partners agreed that they would wait to dissolve the company until after the LCRA Project was completed. They also agreed that Hughes would run the company until the completion of that project, during which time he would draw a salary of no more than $8,000 per month. Finally, the partners agreed that neither Hughes nor Harton could destroy, remove, conceal, encumber, transfer, or otherwise reduce the value of the company's property without the other's consent, or disburse company funds to any party except in the normal course of business. Following this agreement, Harton no longer had any involvement in the operations of Hughes-Harton.

The LCRA Project was completed in August of 2008, and on October 3, 2008, the LCRA deposited $26,583 into Hughes-Harton's bank account as final payment for the contract. This

---

[2] The record does not contain a signed copy of the partners' agreement to dissolve Hughes-Harton, but the State did introduce a letter from Hughes's attorney that explains the terms of the agreement.

3

would be the last significant income that Hughes-Harton received. Three days later, $26,000 was transferred from Hughes-Harton's business account to Hughes's personal bank account. Similarly, in September of 2008, Hughes transferred the certificate of title for two trailers owned by Hughes-Harton to himself. In November of 2008, Hughes sold another trailer that was used by Hughes-Harton for $2,500.[3] Finally, in November of 2008, American Direct Procurement, Inc. ("American Direct") sent Hughes and Harton notice of approximately $15,000 in unpaid debt that Hughes-Harton owed for supplies American Direct provided for the LCRA Project.

Hughes was subsequently charged with misapplication of fiduciary property valued at more than $20,000 but less than $100,000, *see* Tex. Penal Code Ann. § 32.45(c)(5); theft of property valued at more than $1,500 but less than $20,000, *see id.* § 31.03(e)(4) (West 2011); and misapplication of construction trust funds, *see* Tex. Prop. Code Ann. §§ 162.031–.032. The trial court conducted a three-day bench trial in this case.

At trial, the State called a project manager with the LCRA who oversaw Hughes-Harton's progress payments for the LCRA Project. She testified that at various stages of the construction, Hughes-Harton would submit pay requests to LCRA for work the company had performed, and after she verified that the work complied with the contract, she would authorize payment on Hughes-Harton's pay requests. She testified that the $26,583 LCRA transferred to Hughes-Harton's bank account in October of 2008 was the final payment for the LCRA Project, and it included the funds LCRA retained to ensure that the work was performed.

---

[3] Harton testified that Hughes purchased the trailer prior to the formation of Hughes-Harton, but that their company assumed payments for the trailer and he believed that the trailer was Hughes-Harton's property.

Next, the State called Harton, who testified about the formation and ultimate dissolution of Hughes-Harton as outlined above. During Harton's testimony, the State introduced certified copies of financial statements for Hughes-Harton's bank account and Hughes's private bank account. Hughes-Harton's statements show that prior to receiving the final LCRA payment in October of 2008, the company had an account balance of $1,479. The statements for Hughes's personal account show that prior to receiving the $26,000 transfer from Hughes-Harton, Hughes had only $807 in his checking account. Furthermore, Hughes's statements show that within two months of receiving the $26,000 transfer, Hughes spent nearly all of the funds in his personal account, and by the end of November 2008 he was left with only $108. The majority of payments from Hughes's personal account do not appear to be business related, and include mortgage payments for his home totaling nearly $6,000, a $1,000 child support payment, over $2,000 in payments to religious organizations, and a $20,000 payment to Hughes's father. Harton testified that these payments did not relate to Hughes-Harton's business expenses.

Finally, the State called the lawyer who represented Harton in the negotiations to dissolve Hughes-Harton, as well as in Harton's pending lawsuit against Hughes. The lawyer testified that Harton and Hughes agreed to have a final accounting of the company's assets after the LCRA Project was complete. However, after Hughes effectively emptied Hughes-Harton's bank account, the company could not afford to pay for an accounting, and thus he could not determine how much money Hughes may have wrongfully withdrawn from the company in the past.

In his defense, Hughes called Shawnda to testify about her management of Hughes-Harton's accounts. Shawnda testified that she was not a certified public accountant, but that prior

5

to being hired as Hughes-Harton's bookkeeper, she owned her own construction company. She stated that before she was hired, Hughes-Harton used an independent accounting agency to track its income and expenses based on receipts that Harton provided. Hughes did not believe those accounts were accurate, so he terminated his relationship with the accounting agency and had Shawnda redo the company's accounts based on the receipts and invoices they had. Shawnda testified that she entered what information she had into accounting software and relied on this software to determine Hughes-Harton's assets and liabilities.

Shawnda explained that soon after she performed her review of Hughes-Harton's books, she determined that the company would have a difficult time paying its liabilities based on the resources it had. She stated that Hughes's father loaned Hughes $50,000 to help with expenses, and that this money was deposited into Hughes's personal account. After receiving this loan, Shawnda paid $20,000 to one of Hughes-Harton's debtors directly out of Hughes's personal account, and then transferred another $20,000 from Hughes's personal account to Hughes-Harton's business account.

Shawnda further testified that Hughes paid for Hughes-Harton's business expenses out of his personal account in the past, and that she transferred the $26,000 from Hughes-Harton's account to Hughes's personal account in order to reimburse him for those earlier expenses. However, Shawnda also testified that she transferred the $26,000 from Hughes-Harton's business account to Hughes's private account to prevent Harton from withdrawing any funds from the company. Shawnda conceded that Harton had never removed any money from Hughes-Harton after he left the business, but claimed that Hughes was nonetheless concerned that Harton could still withdraw funds from the company's account. Furthermore, Shawnda testified, without much explanation, that she

6

transferred the $26,000 to Hughes's personal account so that he could pay back his father's loan. She also stated that she was not sure she ever told Hughes that she had transferred $26,000 from Hughes-Harton's business account to Hughes's personal account.

Finally, Shawnda explained that she transferred the titles of ownership for two trailers from Hughes-Harton to Hughes to "protect" Harton from liability for any claims that might have arisen after he left the company. She explained that she still believed Harton had a fifty-percent ownership interest in those trailers, despite the transfer of title. She also stated that the $20,000 payment from Hughes's personal account to Hughes's father was for repayment of Hughes-Harton's business loan. Hughes called his father to testify that he loaned Hughes $50,000 and that the $20,000 he received from Hughes in November of 2008 was for repayment of that loan.

After the conclusion of evidence, the trial court convicted Hughes of misapplication of fiduciary property and misapplication of construction trust funds, but acquitted him of theft. Following a punishment hearing, the trial court sentenced Hughes to five years' incarceration for each conviction and ordered Hughes to pay restitution to American Direct and Harton. On appeal, Hughes claims that the evidence presented at trial is insufficient to support his two convictions.

## STANDARD OF REVIEW

In reviewing the sufficiency of the evidence to support a conviction, we determine whether a rational trier of fact could have found that all the essential elements of the crime were proven beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In making this determination, we consider all evidence that the trier of fact was permitted to consider, regardless of whether it was rightly or wrongly admitted. *Clayton v. State*, 235 S.W.3d 772, 778

7

(Tex. Crim. App. 2007); *Allen v. State*, 249 S.W.3d 680, 688-89 (Tex. App.—Austin 2008, no pet.).

We view this evidence in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. The trial court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Therefore, we presume that the court resolved any conflicting inferences and issues of credibility in favor of the judgment. *Id.*

## DISCUSSION

On appeal, Hughes argues that the evidence is insufficient to prove that he misapplied either the fiduciary property of Hughes-Harton or the construction trust funds for American Direct. Specifically, he claims that Shawnda's testimony established that she was responsible for transferring the $26,000 from Hughes-Harton's business accounts to Hughes's personal account, and because Shawnda could not recall telling Hughes about the transfer, the State failed to prove that *he* misapplied the funds. Accordingly, Hughes asserts that "[t]his case, in short, is a tale of a civil dispute complicated by an incompetent bookkeeper, not a criminal case." We review the sufficiency of the evidence to support each conviction separately.

**Misapplication of fiduciary property**

To establish misapplication of fiduciary property, the State is required to prove beyond a reasonable doubt that a defendant (1) intentionally, knowingly, or recklessly misapplied property (2) that he held as fiduciary (3) in a manner that involved a substantial risk of loss to the owner of the property or to the person for whose benefit the property was held. *See* Tex. Penal Code Ann. § 32.45; *Bowen v. State*, 374 S.W.3d 427, 431 (Tex. Crim. App. 2012). In this case, the

8

indictment alleges that Hughes misapplied "U.S. Currency, of the value of $20,000 or more but less than $100,000" in a manner that involved substantial risk of loss of the currency to "Matt Harton, the owner of said" currency, by withdrawing $26,000 from Hughes-Harton's bank account. Thus, the State was required to prove that Hughes intentionally, knowingly, or recklessly misapplied money held for Harton's benefit from the company's account to Hughes's personal account.

On appeal, Hughes asserts that Shawnda's testimony establishes that she in fact transferred the money to Hughes's personal account, and she may not have even told Hughes about the transfer. The trial court, acting as the factfinder, was the sole judge of the credibility of the witnesses and the weight to be given to the evidence. *Clayton*, 235 S.W.3d at 778. Based on the entirety of Shawnda's testimony, the trial court could have reasonably concluded that Shawnda was not a credible witness and thus disregarded her explanation of the events. *See id.*

Beyond the fact that Shawnda was Hughes's wife and thus biased in his favor, Shawnda's explanation of her bookkeeping methods was not corroborated by evidence, and at times defied common sense. During her testimony, Shawnda indicated at least three different motivations for transferring the $26,000 to Hughes's personal account. First, she claimed that she transferred the funds to reimburse Hughes for previous business expenses that he paid for through his personal account. Shawnda could not produce any documents to verify that Hughes had previously paid for business expenses out of his personal account. In fact, the only financial statement she did introduce was Hughes-Harton's previous bank statement, which showed that payments for LCRA Project expenses—as well as other, unattributed expenditures—were being paid for directly out of Hughes-Harton's business account.

9

Second, Shawnda claimed that Hughes "transferr[ed] the $26,000 out of the checking account for the fear that Mr. Harton would" withdraw funds from the company's account. This testimony indicates that Hughes himself transferred the $26,000, which not only contradicts Shawnda's testimony that she was responsible for the transfer, but also is direct evidence of Hughes's guilt. Furthermore, on cross-examination, Shawnda conceded that Harton had never withdrawn any funds from Hughes-Harton's account prior to the $26,000 transfer, and thus it is unclear why Hughes would believe that Harton would suddenly begin stealing company resources six months after he left the company.

Third, Shawnda claimed that she transferred the $26,000 to Hughes's personal account so that Hughes could pay back his father. However, Shawnda did not explain why Hughes's father could not be paid directly from Hughes-Harton's business account, especially given that the payment was allegedly for a loan used by the company. Given that Shawnda's various justifications for the $26,000 transfer were both internally inconsistent and unsupported by evidence, the trial court could have determined she was not a credible witness, and could have even inferred that Shawnda was lying to conceal her husband's criminal conduct.

The State introduced Hughes-Harton's bank statements and Hughes's personal bank statements, which indicated that $26,000 was transferred from the company's account to Hughes's account. The State also introduced evidence that Hughes agreed to operate Hughes-Harton until the completion of the LCRA project, and then Hughes and Harton would divide the company's remaining assets. Finally, the State introduced evidence that after Hughes-Harton's remaining assets were transferred to Hughes's personal account, Hughes spent nearly all of the money in his account within two months, thereby depriving Harton of his share of the company's assets. From this record,

10

the trial court could have reasonably concluded at a minimum that Hughes recklessly misapplied property he held as a fiduciary for the benefit of Harton in a manner that involved substantial risk of loss of Harton's property. Therefore, we conclude that evidence is sufficient to support Hughes's conviction for misapplication of fiduciary funds.[4] We overrule Hughes's first issue on appeal.

**Misapplication of construction trust funds**

To establish felony misapplication of construction trust funds, the State is required to show that the accused (1) retained, used, disbursed, or otherwise diverted trust funds valued at more than $500 (2) without first fully paying the current or past due obligations he owed to the beneficiaries named in the indictment (3) with the intent to defraud the trust beneficiaries. *See* Tex. Prop. Code Ann. § 162.032; *see also Kirschner v. State*, 997 S.W.2d 335, 341–43 (Tex. App.–Austin 1999, pet. ref'd) (identifying elements of felony misapplication of construction trust funds). In this case, the indictment alleges that Hughes diverted more than $500 in funds Hughes-Harton received from LCRA without first paying American Direct for the debt Hughes-Harton incurred in connection with the LCRA project, with the intent of defrauding American Direct.

As in his first appellate issue, Hughes asserts that the evidence is insufficient to support his conviction for misapplication of construction trust funds because Shawnda's testimony

---

[4] This Court requested additional briefing from the parties on what effect, if any, the recent sufficiency-of-the-evidence analysis in *Bowen v. State* has on our disposition of this appeal. *See* 374 S.W.3d 427, 431–32 (Tex. Crim. App. 2012) (holding conviction for misappropriation of fiduciary property must be reformed to reflect second-degree felony where value of property held for benefit of fiduciary named in indictment was insufficient to support first-degree felony conviction). In his reply brief, Hughes states that *Bowen* "does not seem to have any bearing on Appellant's conviction for misapplication of fiduciary property." Therefore, we need not determine whether the evidence is sufficient to support the trial court's finding that Hughes misappropriated property valued at more than $20,000. *See id.*; *see also* Tex. Penal Code Ann. § 32.45(c)(5) (making misappropriation of fiduciary property third-degree felony if value of property is $20,000 or more but less than $100,000).

11

established that she diverted the $26,000 from Hughes-Harton's business account to Hughes's personal account, and thus the State failed to prove that *he* misapplied any funds. As we have already discussed, given the fact that Shawnda's testimony was inconsistent and uncorroborated, the trial court could have reasonably discredited or disregarded her explanation of the underlying events and could have reasonably determined Shawnda was biased. Thus, the court could have reasonably concluded that Hughes was responsible for diverting trust funds into his personal account.

The record establishes that $26,000 was transferred from Hughes-Harton's business account to Hughes's personal account three days after the LCRA paid Hughes-Harton $26,000 for the LCRA Project. The record further establishes that at the time of this transfer, Hughes-Harton still owed American Direct at least $14,700 for supplies it provided for the LCRA Project. Given that Hughes spent the entire $26,000 in his personal account without first paying American Direct the debt owed, the trial court could have reasonably concluded that Hughes diverted more than $500 in funds held in trust for the payment of American Direct, without fully paying American Direct the amount owed, and with the intent of defrauding American Direct of the trust funds. *See Kirschner*, 997 S.W.2d at 341–43. Therefore, we conclude that the evidence is sufficient to support Hughes's conviction for felony misapplication of construction trust funds. We overrule Hughes's second issue on appeal.

## CONCLUSION

Having overruled Hughes's two issues on appeal, we affirm the trial court's judgments of conviction.

12

_____

Scott K. Field, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   April 19, 2013

Do Not Publish

13