**AFFIRM; and Opinion Filed December 22, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-13-01165-CR
No. 05-13-01167-CR
No. 05-13-01168-CR
No. 05-13-01169-CR

**JASMINE LANETTE JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F-1270295-M, F-1270296-M, F-1270403-M, and F-1270404-M**

## MEMORANDUM OPINION

Before Justices Francis, Evans, and Stoddart
Opinion by Justice Francis

A jury convicted Jasmine Lanette Johnson of compelling prostitution and trafficking of two sixteen-year-old girls, J.H. and A.R., and assessed punishment at concurrent sentences of twenty-five years in prison. In two issues, appellant challenges the legal sufficiency of the evidence to support the convictions involving A.R. and the admission of perpetrator profile evidence. For the reasons set out below, we overrule her issues and affirm the trial court's judgments.

J.H. and A.R. met at Jonathan's Place in Garland, a group home for teenagers preparing for adult living before they "age out" of state custody. (J.H. had been removed from her father's care after she had his baby at age thirteen, and A.R. was removed from her grandparents' care after she was arrested for truancy.) The girls disliked Jonathan's Place and wanted to leave.

A.R. had a friend, "Sparkle," who said J.H. and A.R. could stay with her older sister, who was identified as appellant. Neither J.H. nor A.R. believed they would have to pay rent. The girls ran away in November 2011; J.H. left first. When she arrived at appellant's house on Gonzalez Street in Pleasant Grove, appellant knew she was coming and invited her in. Two days later, A.R. arrived. Both girls said appellant knew they were under eighteen. At first, J.H. and A.R. did not do much of anything; they smoked marijuana and drank alcohol provided by appellant. But not long after A.R. arrived, appellant told them they needed to work as strippers to earn money. Sparkle and Brianne both "danced" at a club and tried to teach the girls. Neither, however, caught on, and appellant and Brianne told the girls they needed to "[g]et some tricks," which meant having sex for money.

J.H. testified appellant "explained every bit of it," how to pick up tricks and how to identify police officers. Brianne gave her clothes, and J.H. was given a new name, "Bunny." J.H. said she walked up and down the main street looking for "tricks" and performed sexual favors in the cars of her clients. On one occasion, she took a man back to appellant's house. She also developed clients on a dating chat line. Appellant and Brianne gave her a cell phone to keep the clients' phone numbers. Appellant told her what to charge: $100 an hour or $60 for thirty minutes. She gave all the money she made to appellant and Brianne so that she could stay in their house. Appellant and Brianne called her "money train," because she brought in most of the money.

At first, J.H. said appellant and Brianne were nice. Then, she began getting in "trouble" if she "messed up" by not charging enough for the "tricks" or letting a trick know where they stayed. Once, appellant and a man held her down and beat her backside with a belt. On another occasion, she said appellant held her by her neck against the wall and told her if she messed up again, "it would be worse."

After about three weeks, she was "tired" of her situation. She made up a story so that she could leave. J.H. then stayed with an ex-boyfriend for a few days, but after that, she needed a place to stay and decided to go back to appellant's house. On her way there, she was arrested just outside the house on a runaway charge and taken back to Jonathan's Place. There, she told a staff member what had happened, and the staff member contacted the police. A detective went to appellant's house to investigate and to look for A.R. A. R. was not there at the time. That day, J.H. received a message on Facebook from A.R. wanting to know what she told the police.

Like J.H., A.R. testified she was told to pick up tricks to help with the rent. She walked the streets near the house, either alone or with J.H. She also used the chat room to find clients. Unlike J.H., A.R. did not always stay at the house. At times when she was supposed to be working, she went home to see her grandfather. A.R. said she only had two tricks in a week. She had sex with one of the men in a hotel room that he paid for and had sex with the second man at appellant's house. She said appellant believed she was seventeen, knew she was a runaway, and was a friend of Sparkle's. After J.H. left and the police came to the house, appellant and Brianne told her she needed to leave so the detective would not return and find her there. A.R. left the house briefly, but then returned. At some point, Brianne contacted her and told her she owed money and could not return to the house until the money was paid. The police found A.R. at her grandfather's house in January and arrested her. When the police talked to her, she did not want to cooperate.

On cross-examination, A.R. testified she did not feel appellant and Brianne forced her to do anything and said she did it because she wanted to. She acknowledged that appellant and Brianne asked her to contribute money for rent. Further, she admitted telling a worker that she hated it when people "called it prostitution" because "that was just what she wanted to do." She said she turned over the money she made to appellant and Brianne, but kept some for herself. On

–3–

redirect, she testified about messages she received from Brianne asking for money. The first message, placed on Facebook, said they needed money for the rent, asked if she could help, and instructed her to delete the message when she called. A.R. believed the message was designed to tell her she needed to give them money for staying at their house. Less than two weeks later, A.R. received a text message from Brianne saying A.R. owed them $150 for rent. A.R. responded that "the truck driver never came," meaning a "trick." Brianne responded that there would be a "problem" if A.R. did not pay the money and then told her not to come to the house until she paid the rent.

In addition to the girls' testimony, the State also called the two officers who investigated the case, Detective James Bordelon and Officer Michael McMurray, and their supervisor, Sgt. Byron Fassett, who is an expert in child exploitation cases. Detective Bordelon testified he received a referral from CPS about J.H. J.H. reported to him essentially the same facts that she testified to at trial. He testified that A.R. was not as cooperative as J.H. but did corroborate J.H.'s story that A.R. set up a place for them to go and once they got there, appellant directed them to prostitute and turn over the money to her. His partner, Officer McMurray, identified two exhibits containing the records associated with the cell phones of J.H. and A.R. The records of J.H.'s phone contained a list of contacts, including "Kyle Trickk," "Tom Trickk," "White Jay Trickk," "Steve Tric," among others, as well photographs of J.H. and of the interior of appellant's house. The record from A.R.'s phone included the text messages from Brianne wanting her to pay $150.

Sgt. Fassett testified as an expert and detailed his background, education, qualifications, training, and experience. Although he had not interviewed J.H. or A.R., he was familiar with the facts of their cases. Fassett had worked in the child exploitation squad for more than twenty years and had developed a high-risk victim model to identify and locate child victims of sex

trafficking. Most of the children, he said, were runaways who did not see themselves as victims, were repeat victims of sexual abuse, and children who had been arrested for child sex trafficking or child prostitution. He explained that children cannot make it on the street on their own but need adult support. They want love, affection, attention, and a sense of belonging, and they have only "one commodity to sell," their bodies. A pimp traps or lures the child with an offer of a safe place to stay and a sense of security. Once there, the pimp lowers the child's inhibitions by showing "what it is all about," "[e]verybody does it," and it is not that "big of a deal." The victims become complicit in their exploitation and generally protect the pimp and "bottom girl." The "bottom girl" is the No. 2 person in a pimp's organization. According to Fassett, she may act as the enforcer, the finder of girls, and the collector of money, but the pimp is the one in charge. The child victims feel this "new place" is the only place where they have been made to feel someone cares for them. They protect the people exploiting them because they believe they have no other place to go. Fassett explained it is no different than the family violence victim who returns to the abuser because she has nowhere to go or the child who protects the father who abuses her.

In her defense, appellant called five family members and friends who testified they had been to the Gonzalez Street house, lived in the neighborhood, or visited the neighborhood during late 2011 and 2012. Each of the witnesses said he or she had never seen any evidence of prostitution. Specifically, they testified they did not see men coming and going from the house nor did they see cars parked outside the house.

In her first issue, appellant contends the evidence is legally insufficient to show that she trafficked or caused A.R. to engage in prostitution or that she compelled A.R. to commit prostitution. Rather, she argues, the evidence shows A.R. willingly came to her house, was not

forced to commit prostitution, and only paid appellant money to contribute to the rent while staying at her house.

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* Direct and circumstantial evidence are treated equally. *Id.*

To obtain a conviction for compelling prostitution, the State was required to prove beyond a reasonable doubt that appellant knowingly caused A.R., a person younger than eighteen, to commit prostitution, regardless of whether appellant knew A.R.'s age at the time appellant committed the offense. TEX. PENAL CODE ANN. § 43.05 (West Supp. 2014). Prostitution includes offering to engage, agreeing to engage, or engaging in sexual conduct for a fee or soliciting another in a public place to engage with the person in sexual conduct for hire. *Id.* § 43.02(a)(1), (2). "[T]he actual commission of the offense of prostitution is not a prerequisite to the commission of the offense of compelling prostitution." *Waggoner v. State*, 897 S.W.2d 510, 513 (Tex. App.—Austin 1995, no pet.). One who provides opportunity for a willing minor to engage in prostitution and influences, persuades, or prevails upon her to do so has caused the prostitution. *Id.* at 512.

To obtain a conviction for trafficking, the State was required to prove beyond a reasonable doubt that appellant knowingly trafficked A.R., a child, by transporting, enticing,

recruiting, harboring, providing, or otherwise obtaining her and by any means caused A.R. to engage in, or become the victim of, prostitution. TEX. PENAL CODE ANN. §§ 20A.02(a)(7)(E); 20A.01(4) (West Supp. 2014). A child means a person younger than 18 years of age. *Id.* § 20A.01(1).

Appellant argues the evidence fails to support her convictions because (1) A.R. willingly came to appellant's house because she was friends with Sparkle; (2) A.R., a runaway, stayed briefly at the house but would leave to go to her grandfather's house when she wanted; (3) appellant and Brianne only suggested A.R. learn to dance or "get some tricks" to pay for staying at the house, and appellant did not instruct her on how to prostitute; (4) A.R. was not forced or compelled to prostitute, but did so because she wanted to; and (5) Brianne, not appellant, asked A.R. for money to help pay rent "with no mention of money being obtained from prostituting." She argues appellant was found guilty of the offenses against A.R. because of the compelling evidence relating to J.H. Appellant's argument is without merit.

The evidence showed appellant's younger sister, Sparkle, arranged for A.R. and J.H. to stay with the appellant. When the girls left Jonathan's Place for appellant's house, neither expected she would have to pay money to stay there. But, shortly after they arrived, appellant told them they needed to pay rent. Brianne and Sparkle tried to teach A.R. to strip dance, but she could not pick it up. After that, appellant and Brianne told A.R. she needed to "[g]et some tricks" to help with the rent. A.R. explained that meant having sex for money. A.R. walked the streets near the house to pick up clients or worked a chat line, ultimately picking up two clients in one week. She gave the money she earned to appellant and Brianne, but kept some for herself.

The jury could have reasonably concluded that appellant recruited A.R. and J.H. through her sister Sparkle. Further, the jury could have considered A.R.'s testimony through the context provided by Sgt. Fassett, who explained how pimps take advantage of child runaways like A.R.

The jury could have believed that appellant knew A.R. could not care for herself and lured her in by offering a place to stay and security, and then requiring money for rent when she knew A.R. had limited means of earning money. That A.R. showed any willingness to prostitute does not mean that appellant did not cause her to engage in prostitution. Appellant not only provided her the opportunity (by, at a minimum, providing a place to bring one of her clients), she persuaded or prevailed upon her to do so. *See Waggoner*, 897 S.W.2d at 512. To the extent appellant suggests the State needed to show "force," the State did not allege that as a basis. *See* TEX. PENAL CODE ANN. § 43.05(a)(1). Rather, because A.R. was under the age of eighteen, the State needed only to demonstrate "any means" by which appellant caused A.R. to act. *See id.* § 43.05(a)(2); *Waggoner*, 897 S.W.2d at 512. Finally, the jury had J.H.'s testimony from which it could draw reasonable conclusions about appellant's motives and the operations in the house. According to J.H., appellant controlled the house, explained "every bit" of prostitution to her, and beat her when she "messed up." From this, the jury could have concluded appellant was a pimp whose intent was to prostitute A.R. and J.H. for money. We conclude the evidence is legally sufficient to support appellant's convictions for trafficking and compelling the prostitution of A.R. We overrule the first issue.

In her second issue, appellant contends the trial court erred by permitting Fassett to testify to a perpetrator profile in juvenile prostitution. Within this issue, appellant acknowledges Fassett's testimony about child trafficking was relevant to help the jury understand how children like A.R. "get into a situation where they are seemingly willing to engage in prostitution." From there, she asserts the State went "beyond this line of questioning to portray the character and motivation of a perpetrator" and concludes the admission of the evidence was an abuse of discretion. Appellant does not, however, identify the particular evidence of which she is

complaining nor does she provide any substantive analysis. Under these circumstances, we conclude appellant's issue is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

We affirm the trial court's judgments.


/Molly Francis/
MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

131165F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JASMINE LANETTE JOHNSON,
Appellant

No. 05-13-01165-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1270295-M.
Opinion delivered by Justice Francis;
Justices Evans and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of December, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JASMINE LANETTE JOHNSON,
Appellant

No. 05-13-01167-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1270296-M.
Opinion delivered by Justice Francis;
Justices Evans and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of December, 2014.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JASMINE LANETTE JOHNSON,
Appellant

No. 05-13-01168-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1270403-M.
Opinion delivered by Justice Francis;
Justices Evans and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of December, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JASMINE LANETTE JOHNSON,
Appellant

No. 05-13-01169-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1270404-M.
Opinion delivered by Justice Francis;
Justices Evans and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of December, 2014.